### In re MERRILL LYNCH LIMITED PARTNERSHIPS LITIGATION.

#### No. 95Civ.10657(MBM).

United States District Court, S.D. New York.

Aug. 25, 1997.

Nicholas E. Chimicles, Lisa Chanow Dykstra, Chimicles, Jacobsen & Tikellis, Haverford, PA, Melvyn Weiss, Patricia M. Hynes, Salvatore Graziano, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY, Co–Lead Counsel for Plaintiffs.

Wesley G. Howell, Jr., Robert F. Serio, Jr., Gibson, Dunn & Crutcher, New York, NY, Edward J. Yodowitz, Skadden, Arps, Slate, Meagher & Flom, New York, NY, for Defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Investors in a series of Merrill Lynch real estate limited partnerships sue Merrill Lynch & Company, Inc. ("Merrill Lynch & Co ."), their wholly-owned subsidiaries, Merrill Lynch, Pierce Fenner & Smith & Co. ("Merrill Lynch, Pierce") and Merrill Lynch, Hubbard Inc. ("MLH"), and 18 limited partnerships or corporations wholly-owned or controlled by MLH, which functioned as the general partners or associate general partners of the limited partnerships at issue. Plaintiffs assert class claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), as well as assorted state common law and statutory claims. Defendants move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), arguing both that plaintiffs have failed to state claims entitling them to relief, and that their claims are barred by the statute of limitations. For the reasons outlined below, plaintiffs' RICO claims are dismissed on statute of limitations grounds, and I decline to exercise supplemental jurisdiction over plaintiffs' state law claims.

## I.

Plaintiffs' claims relate to a series of real estate limited partnerships which defendants created and offered for sale from 1979 to 1987. The limited partnerships fall into two groups. The MLH Properties Limited Partnerships I–III ("MLH Prop. I–III") were to invest in leveraged real estate transactions. Initially, these limited partnerships were to provide investors with losses yielding tax benefits. Over time, MLH Prop. I–III were to yield annual income payments and long-term capital appreciation. (Compl.¶ 82)[1] MLH Income Realty Partnerships I–VI ("MLHIRP I–VI") were to invest in real estate on an all-cash basis and provide investors with an immediate annual cash flow and long-term capital appreciation. (*Id.*) The named plaintiffs represent investors in each of these nine partnerships and the class they represent has been defined as "[a]ll investors who purchased units [in the initial offering or in the secondary market created by defendants] in any of MLH Properties Limited Partnership I–III or MLH Income Realty Partnerships I–VI (The "Partnerships") from the inception of the offer and sale of such Partnerships to the present." (*Id.* ¶ 54) The final closing dates of the public offerings of these investments were: MLH Prop. I—November 29, 1979; MLH Prop. II—December 16, 1980; MLH Prop. III—December 1, 1982; MLHIRP I—February 16, 1982; MLHIRP II—January 31, 1983; MLHIRP III—July 1, 1983; MLHIRP IV—August 1, 1984; MLHIRP V—July 8, 1985; MLHIRP VI—May 7, 1987. (Def. Mem. at 4 n. 4)

Plaintiffs allege that each defendant had a role in these limited partnerships. They claim that Merrill Lynch & Co. or its subsidiaries or employees "were responsible for the development, organization, sale, operation, or management of the Partnerships in the [alleged] scheme" (Compl.¶ 41); that Merrill Lynch, Pierce acted as the offeror and/or underwriter for the sale of some of these partnerships (*id.* ¶ 43); that MLH, through its subsidiaries, acted as general partner, managing general partner, or associate general partner of these partnerships and controlled their operations (*id.* ¶ 45); and that

18 of MLH's subsidiaries served as general partners or associated general partners of the limited partnerships (*id.* ¶ 46).

Plaintiffs allege violations of RICO, 18 U.S.C. §§ 1962(a), (c) & (d). As predicate acts for their RICO claims, plaintiffs allege mail and wire fraud in violation 18 U.S.C. §§ 1341 and 1343, and securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and §§ 11 and 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k & 77l(2). (*Id.* ¶¶ 187–88)

The allegedly fraudulent misrepresentations or omissions plaintiffs allege fall into several categories. Plaintiffs claim first that defendants' "guaranteed" specific annual yields and long-term capital appreciation, even though they knew from prior experience, and from their internal projections of expected yields from real property, that these guaranteed yields could not be achieved. (Compl.¶¶ 2, 58, 62, 63, 66, 67, 73, 75, 93, 98, 103–05, 108, 117–18, 132) Plaintiffs assert that "[d]efendants' entire marketing scheme thus represented, promised, characterized, and fostered the reasonable expectation that the percentage priority returns of each of the Partnerships was, as Defendants' own internal written materials stated, a 'yield guarantee.'" (*Id.* ¶ 66)

Relatedly, plaintiffs allege that defendants marketed the investments as safe and conservative. They claim that defendants emphasized their expertise in real estate investments, their careful investigation of properties, and in relation to the MLHIRP Limited Partnerships, the all-cash nature of the investment, and represented that these features would allow the investments to achieve the alleged guaranteed returns. (*Id.* ¶¶ 85–87, 89–92) Plaintiffs claim that in fact, the investments were not safe because their guaranteed yields and long-term capital appreciation were unattainable. (*See, e.g., id.* ¶¶ 95–96) Further, they claim that the statements relating to defendants' expertise and the all-cash nature of the MLHIRP limited partnerships were misleading because defendants were aware that these features would

---

1. "Compl." refers to the Second Consolidated Amended Class Action Complaint.

not assist the limited partnerships in attaining the guaranteed yields. (*Id.* ¶ 93)

Plaintiffs claim second that defendants led them to believe that "the limited partnership sponsors would not make money until the limited partners had received their capital back plus the cumulative per annum yields promised." (*Id.* ¶ 2) For example, plaintiffs allege that internal marketing guides for MLHIRP I reported that "the MLHIRP product tied compensation of the managing general partner to the availability of net distributable cash every year [and that t]he managing general partner of the MLHIRP series was then required to 'subordinate its 10% share of distributable cash if that is necessary to enable the Limited Partners to receive a minimum 8% cumulative yield on their investment.'" (*Id.* ¶ 65)

Third, plaintiffs claim that defendants represented that prior partnerships were meeting their objectives, including guaranteed annual distributions, but failed to disclose that those annual distributions were being funded in part from return on capital and return from non-real estate investments. (*Id.* ¶¶ 2, 60, 64, 68, 96, 108, 109–114, 119–21, 132, 136)

Fourth, plaintiffs claim that defendants failed to disclose the returns that the properties would have to generate for the limited partnerships to reach their stated objectives. (*Id.* ¶¶ 4, 61, 62, 64, 68, 102, 108)

Fifth, plaintiffs claim that defendants did not disclose their intention of keeping cash reserves, uninvested in real estate, to supplement shortfalls in income from the properties and thereby to keep limited partner distributions at the promised levels. (*Id.* ¶¶ 6, 74, 84, 102, 108, 122–29) Plaintiffs claim that defendants maintained uninvested capital reserves in amounts ranging from 6.3% for MLHIRP I to 13.9% for MLHIRP VI, well above the levels of reserves disclosed the prospectuses. (*Id.* ¶ 125)

In addition to these alleged misrepresentations or omissions, which form the basis for most of the mail and wire fraud and for all of the securities fraud claims—the predicate acts for the RICO claims—plaintiffs allege other improprieties. They claim that defendants knowingly or recklessly purchased properties that did not meet the criteria necessary to deliver the guaranteed annual yields and long-term capital appreciation. (*Id.* ¶¶ 3, 69, 70–73, 75, 76, 78, 103, 106). Further, plaintiffs claim that defendants used the illusion of a secondary market to create an aura of liquidity and made no attempt to obtain the best price for sellers of limited partnership units. (*Id.* ¶¶ 139–44)

Finally, plaintiffs allege that defendants concealed these misrepresentations, omissions and breaches in performance by continually reassuring investors that the partnerships were "on-track," and that shortfalls were temporary. (*Id.* ¶¶ 77, 146–179) They claim also that defendants' account statements concealed the fraud by "listing the original cost of the unit on client account statements and by labeling such valuation as 'current price' or 'market price.'" (*Id.* ¶¶ 78, 174) These allegations form the basis of the other mail and wire fraud claims, *i.e.*, that defendants mailed fraudulent reports and statements to investors to mislead them.

In addition to the RICO claims, plaintiffs allege state law claims, including fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, tortious interference with contract, and violation of the New Jersey Uniform Securities Act, N.J. Stat. Ann. § 49:3–71, and the New Jersey Criminal Justice Act of 1970, N.J. Stat. Ann. § 2C:41–2.c–2.d.

Several cases were filed against defendants relating to these limited partnerships. *See Lanza v. Merrill Lynch & Co.*, 95 Civ. 10657(MBM) (S.D.N.Y. filed Dec. 15, 1995); *Rose v. Merrill Lynch & Co.*, 95 Civ. 10894(MBM) (S.D.N.Y. filed Dec. 22, 1995); *Keleman v. Merrill Lynch & Co.*, 96 Civ. 0898(MBM) (S.D.N.Y. filed Feb. 6, 1996); *Carnegie v. Merrill Lynch & Co.*, Civ. Action No. 95–4030–B (RBB) (S.D. Cal. filed Nov. 29, 1995). On February 25, 1996, I issued stipulated Case Management Order No. 1, which consolidated these actions and provided that:

Plaintiffs' First Consolidated Class Action Complaint shall be filed by March 29, 1996 and shall be deemed the operative complaint superseding all complaints filed in any of the actions consolidated hereunder

or in any Related Action.... Plaintiffs, without being required to file a motion pursuant to Rule 15 of the Federal Rules of Civil Procedure, shall be permitted to file a Second Consolidated Amended Class Action Complaint after Plaintiffs have had a reasonable opportunity to take document discovery.

On March 29, 1996, plaintiffs filed their First Consolidated Amended Class Action Complaint. Instead of responding to document discovery, defendants stated that they would file a motion to dismiss. (Chimicles Decl. ¶ 5)

The parties then agreed to Case Management Order No. 2, which I issued on July 7, 1996, and under which a class was certified and document discovery was to proceed. The Order provided further that defendants could file a motion to dismiss the First Amended Class Action Complaint no later than 60 days after the entry of the Order and that plaintiffs would then inform defendants whether they intended to stand on their complaint. If plaintiffs chose to file a second amended complaint, defendants would then have 45 days from service of that complaint to supplement, modify or withdraw any previously filed motion to dismiss. Document discovery then proceeded, although plaintiffs claim that defendants did not produce all pertinent documents.

On September 27, 1996, defendants filed a motion to dismiss the First Consolidated Amended Complaint and to stay further discovery. On October 15, 1996, at a pre-trial conference, plaintiffs sought to compel further discovery and to postpone consideration of the motion to dismiss. I denied that motion and gave plaintiffs the option of either filing opposition papers to the motion to dismiss, in which they could specify the discovery they required to answer that motion, or filing a second amended complaint. I emphasized to plaintiffs that if they chose the second route, leave to amend their complaint for the third time would likely not be granted. Plaintiffs opted to file a second amended complaint, and pursuant to an order dated October 21, 1996, defendants' motion to dismiss was deemed withdrawn.

On January 17, 1997, plaintiffs filed a Second Consolidated Amended Complaint. On February 14, 1997, defendants again moved to dismiss.

## II.

Defendants argue first that plaintiffs' RICO claims are barred by the statute of limitations. They claim that plaintiffs sustained their RICO injury when they bought the allegedly fraudulent limited partnerships and that the statute of limitations began to run when plaintiffs had inquiry notice of the probability that they had been defrauded. Defendants claim that disclosures in the original prospectuses and in subsequent partnership communications put plaintiffs on inquiry notice more than four years before they filed this action. Further, defendants claim that plaintiffs have failed to plead adequately any fraudulent concealment of the fraud and therefore the action must be dismissed as time-barred.

### A. *Consideration of Materials Outside the Complaint*

■ To prove their claim that plaintiffs were on inquiry notice before November 1991, defendants rely on the limited partnership prospectuses and on the annual reports distributed to the limited partners. Usually, evidence on a motion to dismiss is limited to the face of the complaint and all allegations are accepted as true. However, on a motion to dismiss in a securities fraud or RICO action, the Second Circuit permits consideration of: 1) documents attached as exhibits to or incorporated by reference into the complaint, *see Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989); 2) documents "integral" to the complaint, even if the complaint contains only limited quotation from those documents, *see San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 808 (2d Cir.1996) (citing *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991)); and 3) documents filed with the Securities and Exchange Commission of which plaintiff has notice in responding to the motion to dismiss, *see Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773–74 (2d Cir.1991). Further, the Second Cir-

cuit has found that when a plaintiff is given notice that the defendant wishes the court to consider such documents and argues their contents, this weighs in favor of consideration. *See San Leandro,* 75 F.3d at 809; *Kramer,* 937 F.2d at 774; *see also Salinger v. Projectavision, Inc.,* 934 F.Supp. 1402, 1405 (S.D.N.Y.1996); *Behette v. Saleeby,* 842 F.Supp. 657, 662 (E.D.N.Y.1994).

Here, the prospectuses and the annual reports to limited partners may be considered. First, defendants represent that the prospectuses and the annual reports were filed with the Securities and Exchange Commission (Def. Reply Mem. at 5 n. 5), and therefore I may take judicial notice of them. *See, e.g., Siebert v. Nives,* 871 F.Supp. 110, 114 (D.Conn.1994) (Cabranes, J.) (considering publicly-filed annual report); *In re Integrated Resources, Inc. Real Estate Ltd. Partnerships Sec. Litig.* ("*Integrated Resources II*"), 850 F.Supp. 1105, 1125–26 (S.D.N.Y. 1993) (considering publicly-filed 10–K statements); *In re General Dev. Corp., Bond Litig.,* 800 F.Supp. 1128, 1136 (S.D.N.Y.1992) (considering publicly-filed annual and quarterly reports), *aff'd sub. nom. Menowitz v. Brown,* 991 F.2d 36 (2d Cir.1993). Second, because of their centrality to· any offering and because plaintiffs claim that they reinforced the misrepresentations made in other marketing materials (Compl.¶¶ 101–08), the prospectuses are integral to this complaint. *See, e.g., I. Meyer Pincus,* 936 F.2d at 762; *Geiger* v. *Solomon–Page Group, Ltd.,* 933 F.Supp. 1180, 1182 (S.D.N.Y.1996); *Integrated Resources II,* 850 F.Supp. at 1122 n. 21. In addition, plaintiffs' complaint relies heavily on and quotes from the annual reports to show that defendants concealed the fraud. (Compl.¶¶ 156(b), (d), 157, 159, 161, 162, 163) Third, plaintiffs have not contested reliance on these documents; in fact, plaintiffs have submitted further excerpts from the prospectuses and the annual reports in the appendix to their memorandum of law. (*See also* Reply Mem. in Support of Motion to Convert to Summary Judgment at 2) In sum, plaintiffs had notice that these prospectuses and annual reports would be considered on this motion, did not object, and actually responded to them.

## B. *RICO Injury*

■ Civil RICO claims are subject to a four-year statute of limitations. *See Agency Holding Corp. v. Malley–Duff & Assoc., Inc.,* 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The statute cannot begin to run until the RICO action is ripe, and a RICO action is ripe when the plaintiff suffers an injury. *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1103 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

### 1. *Plaintiffs Sustained RICO Injury When They Bought the Limited Partnerships*

■ Defendants claim that plaintiffs sustained RICO injury when they purchased their limited partnership interests. Defendants argue that because plaintiffs allege that the limited partnerships were fraudulent at the time the partnerships were offered to them, plaintiffs were injured immediately upon investment when they paid more money than the partnership units were actually worth. Accordingly, defendants argue, because the limited partnerships were offered from 1979 to 1987, the latest a plaintiff could have sustained RICO injury was 1987.

Several courts in this District have held that "[w]here ... plaintiffs acquired limited partnership interests based upon defendants' alleged fraudulent statements and offering material, the injury to plaintiffs is the purchase of the partnership interests." *Fisher v. Reich,* No. 92 Civ. 4158, 1995 WL 23966, at *3 (S.D.N.Y. Jan.10, 1995); *see also In re PaineWebber Ltd. Partnerships Litig.,* 171 F.R.D. 104, 128 (S.D.N.Y.1997); *Butala v. Agashiwala,* 916 F.Supp. 314, 317 (S.D.N.Y. 1996) ("The plaintiffs allege that these investments were fraudulent from their inception. Consequently, the plaintiffs were injured when they purchased them."); *Ackerman v. National Property Analysts, Inc.,* 887 F.Supp. 494, 503 (S.D.N.Y.1992); *Lenz v. Associated Inns and Restaurants Co. of Amer.,* 833 F.Supp. 362, 370 (S.D.N.Y.1993). Plaintiffs' RICO claims are based upon defendants' alleged fraudulent statements and omissions which induced plaintiffs to invest in

the limited partnerships. Therefore, under the rule of these cases, plaintiffs sustained injury at the time of their investment.

However, plaintiffs claim that RICO injury does not occur until the damages are clear and definite. They claim their damages were speculative and indefinite at the time they bought their limited partnership interests and that damages became clear and definite only when plaintiffs were notified in 1994 that the partnerships had suffered permanent impairments in value and that the previously promised returns would not be met. Until then, plaintiffs argue, they suffered no injury, their RICO claims were not ripe, and the statute of limitations did not begin to run.

Plaintiffs rely on *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 767 (2d Cir.1994), *cert. denied*, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995) and *Cruden v. Bank of New York*, 957 F.2d 961, 977–78 (2d Cir.1992). In *First Nationwide Bank*, the plaintiff bank claimed that the defendants misrepresented the value of collateral securing certain loans, and brought a RICO action. The Second Circuit found that the plaintiff had not sustained RICO injury and the claim was not ripe because the plaintiff had not exhausted its remedies under the notes. The Court held that "a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can only pursue the RICO treble damages remedy after his contractual rights to payment have been frustrated." 27 F.3d at 768. The Court reasoned that a note holder has not really suffered injury until he has exhausted his bargained-for remedies under the note. *Id.; see also Burke* v. *Dowling*, 944 F.Supp. 1036, 1052 (E.D.N.Y.1995) ("Until these plaintiffs can demonstrate that the orthodox methods of recovery have failed them, and that defendants' acts of racketeering have in fact caused them a loss, they should not be entitled to treble damages under RICO.").

In *Cruden*, debenture holders brought RICO claims against the issuers, alleging fraudulent transfer of assets. 957 F.2d at 977. The Second Circuit held that plaintiffs suffered no RICO injury until the defendants defaulted on the principal and interest pay-

ments on the debentures held by the plaintiffs. *Cruden*, 957 F.2d at 977–78.

Both *Cruden* and *First Nationwide Bank* relied on *Bankers Trust*. In *Bankers Trust*, the plaintiff claimed that it had been deprived of full payment on its loans to the defendants because it had agreed to a reduced settlement with the defendants in a bankruptcy proceeding in which the defendants had engaged in fraud. 859 F.2d at 1005–06. However, at the time of the suit, the bankruptcy proceeding had been reinstated, and the court held that because plaintiff could receive full payment on its loans in the reinstated bankruptcy proceeding, plaintiff had not yet suffered RICO injury and its RICO claim was not ripe. The Court found that it was "impossible to determine the amount of damages that would be necessary to make plaintiff whole, because it [was] not known whether some or all of the fraudulently transferred funds [would] be recovered by the corporation [in the bankruptcy proceeding]," and therefore the injury was speculative. *Id.*

This trilogy of cases stands for the proposition that when a creditor has been defrauded, but contractual or other legal remedies remain which hold out a "real possibility" that the debt, and therefore the injury, may be eliminated, RICO injury is speculative, and a RICO claim is not ripe until those remedies are exhausted. *See, e.g., Turkish v. Kasenetz*, 964 F.Supp. 689, 695 (E.D.N.Y. 1997) ("[I]f a plaintiff has an unexplored alternative means of recovery, the RICO action is not considered 'ripe.' "); *Burke*, 944 F.Supp. at 1051. However, that trilogy does not control this case.

Here, unlike the above cases which involved debt instruments, plaintiffs had no contractual or legal remedy that might have reduced or eliminated their injury. Rather, the limited partnerships were equity investments with no basis for recovery other than the limited partnerships' performance. The above cases are therefore limited to actions involving debt instruments which contain bargained-for remedies after default which the debtor is expected to pursue. In fact, *First Nationwide Bank* relies on cases dealing with the determination of damages relat-

ing to fraudulently induced loans. 27 F.3d at 768. Moreover, plaintiffs' injuries were not speculative at the time of their investment. Plaintiffs allege that the limited partnerships were fraudulent because even at the outset, the limited partnerships could never achieve their promised objectives. Accepting that allegation as true, plaintiffs sustained recoverable out-of-pocket losses when they invested. Even if plaintiffs had sued at that time, plaintiffs' damages—that is, the difference between the value of the investment they were promised and the value of the investment they received—would not have been speculative. When the RICO action is ripe at the time of investment, plaintiffs are not penalized, even if they are unaware of the fraud, because, as noted below, the statute of limitations does not run until the plaintiffs have actual or inquiry notice of the fraudulent scheme.

Plaintiffs argue further that even if they sustained a RICO injury when they invested, because the amount of damages was not certain until defendants informed them that the limited partnerships would never meet their objectives, the RICO action was not ripe. Plaintiffs rely on language from *First Nationwide Bank*, to the effect that, "as a general rule, a cause of action does not accrue until the amount of damages becomes clear and definite." 27 F.3d at 768. However, this language was dictum, and cannot be interpreted to mean that the exact amount of damages must be certain before the action is ripe. *First Nationwide Bank* cited *Bankers Trust* in support of this statement, and that case, as noted, stands for the proposition that the injury cannot be speculative, not that the amount of damages must be certain for the action to be ripe. Moreover, 18 U.S.C. § 1964(c) provides a remedy for "[a]ny person injured in his business or property." 18 U.S.C. § 1964(c) (1994). A plain interpretation of this language suggests that the plaintiff need only be injured, not that the amount of damages be certain.

Since *First Nationwide Bank*, other Courts have held that a RICO claim accrues when the plaintiff has sustained an injury, even if the amount of the damage is not certain. For example, in holding that a

RICO injury may accrue before the exact amount of damages is determined, the *Butala* Court noted that "[t]he plaintiffs' argument that their cause of action did not accrue until their damages were ascertainable is premised on a misunderstanding of the difference between when an injury occurs and when the damages resulting from that injury are fully quantifiable." *Butala*, 916 F.Supp. at 317. The Court held that the injury occurred when the plaintiffs bought their allegedly fraudulent limited partnerships and not when the damages "crystallized." *Id.* Similarly, in *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 378 (S.D.N.Y.1997), the Court read *Bankers Trust* to hold that "where an injury is 'speculative' or its 'amount and nature unprovable,' no RICO cause of action accrues until the injury 'become[s] definite'. . . . On the other hand, a RICO injury need not be precisely calculable in order to be sufficiently definite and nonspeculative for a civil RICO cause of action to accrue." 170 F.R.D. at 378 (citing *Bankers Trust*, 859 F.2d at 1106 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 339, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971))); *see also 131 Main St. Assocs. v. Manko*, 897 F.Supp. 1507, 1517 (S.D.N.Y. 1995) ("*Bankers Trust* does not say that a potential plaintiff must be able to calculate his loss down to the penny before his RICO injury can be said to exist; all that is required is that the injury not be 'speculative.' "). Here, plaintiffs' injuries occurred when they invested in the limited partnerships, and their RICO actions were ripe at the latest in 1987 when the last limited partnership interest was sold.

### 2. The "Separate Accrual" Rule

Plaintiffs argue that the "separate accrual" rule, announced by the Second Circuit in *Bankers Trust*, governs this case. Under that rule, any new and independent injury occurring within the four years before the filing of this lawsuit may support a RICO action, and damages may be recovered for that injury.

"In *Bankers Trust*, defendants, officers of a bankrupt corporation, fraudulently concealed assets of the bankruptcy estate through a complicated series of transac-

tions, and instituted frivolous lawsuits against plaintiffs to prevent them from recovering a legitimate debt. *See* 859 F.2d at 1098–99. Plaintiffs incurred various legal fees and expenses over time, besides the loss of the debt itself. ... Noting that in enacting RICO, Congress had in mind the possibility of 'multiple and independent [injuries] that occur over a broad span of time,' [the Second Circuit] held that a rule permitting a new cause of action to accrue with each independent injury was '[t]he logical end result.'" *Id.* at 1103.

*Bingham v. Zolt*, 66 F.3d 553, 561 (2d Cir.1995), *cert. denied*, 517 U.S. 1134, 116 S.Ct. 1418, 134 L.Ed.2d 543 (1996). Under the "separate accrual" rule, "each time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury." *Bankers Trust*, 859 F.2d at 1105.

Plaintiffs argue that they sustained a new and independent RICO injury each time they received a misleading partnership communication, such as the annual reports, and sustained injuries well within the four-year limitations period because they claim they received many misleading statements within that time. (*See, e.g.,* Compl. ¶ 78)

However, for an injury to trigger the accrual of a new RICO claim, the injury must be new and independent; "non-independent injuries will not cause a new limitations period to accrue." *See Bingham,* 66 F.3d at 560. Thus, in *Bankers Trust,* the defendant was accused of several acts which produced three separate types of injury: past legal fees and other expenses resulting from fighting frivolous lawsuits and seeking to reopen the fraudulent bankruptcy proceeding, loss of a legitimate debt and related expenses, and future legal fees and related expenses. *Id.* at 1105. Each injury was new and independent; the loss of the debt was independent from the past and future legal fees which resulted from frivolous lawsuits and other fraudulent tactics.

In *Bingham,* the defendants "developed and implemented numerous schemes that allegedly diverted foreign music assets and royalty income from [Bob] Marley's estate to themselves." 66 F.3d at 556–57. The Court found that although the case involved "a continuing series of fraudulent actions undertaken to divert and conceal assets and income," the assets were diverted through a variety of schemes to misappropriate money from different sources which were related only in their ultimate goal. Therefore, the Court held that "each illegal diversion constituted a new and independent legally cognizable injury to the estate" and "[a]s a consequence, with each diversion a new civil RICO cause of action accrued." *Id.* at 561.

Here, defendants' alleged fraudulent mailings after plaintiffs purchased the limited partnership interests did not cause plaintiffs new and independent injury. This case is not similar to *Bingham,* which involved a series of unrelated fraudulent transactions. Here, plaintiffs' injury occurred when they paid for the fraudulent investments. Defendants' alleged later activities were part of an effort to cover up the earlier fraud, which had already caused plaintiffs' injury. The concealment caused no new and independent losses. *Cf. Long Island Lighting Co.* v. *Imo Indus. Inc.,* 6 F.3d 876, 887 (2d Cir.1993) (holding that injury sustained from installation of generators was not independent from injury sustained when generators were purchased). Thus, plaintiffs did not sustain a new and independent RICO injury with each fraudulent mailing and they may not rely on the mailings made within four years of the filing of the action to support their RICO claims.

C. *The Running of the Statute of Limitations*

Although a RICO claim is ripe at the time of injury, the statute of limitations does not always begin to run when the claim is ripe. Rather, the Second Circuit has adopted the "injury discovery" rule to define when the statute of limitations begins to run: "a plaintiff's action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury." *Bankers Trust,* 859 F.2d at 1102–03. Therefore, the statute of limitations begins to run when the plaintiff is on actual or inquiry notice of the fraud. *See 131*

*Main St. Assocs.*, 897 F.Supp. at 1514 ("A plaintiff must obviously still have, in addition to knowledge of his injury, actual or constructive knowledge of the 'bad acts' causing the injury in order for the limitations period to accrue.").

### 1. Inquiry Notice

■ A plaintiff need not be aware of all aspects of the alleged fraud to be on inquiry notice; rather, a plaintiff is on inquiry notice at "the time at which the plaintiff should have discovered the general fraudulent scheme." *In re Integrated Resources, Inc. Real Estate Ltd. Partnerships Sec. Litig. ("Integrated Resources III")*, 851 F.Supp. 556, 568 (S.D.N.Y.1994) (quotations and citations omitted); *see also Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir.1993) ("A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the fraud."), *cert. denied*, 511 U.S. 1019, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994). Further, when a plaintiff is placed on notice of the probability of fraud, he has a duty to inquire, and he will be charged with all knowledge that he would have obtained had he exercised reasonable diligence. *See Dodds*, 12 F.3d at 350; *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983). As the Second Circuit said in *Armstrong*, "The test as to when fraud should have with reasonable diligence been discovered is an objective one." 699 F.2d at 88; *see also Benfield v. Mocatta Metals Corp.*, 26 F.3d 19, 22 (2d Cir.1994) ("[I]f inquiry would have disclosed Mocatta's participation in the wrongdoing as an aider and abettor, knowledge of that fact was properly imputed to plaintiffs."); *Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir.1992) ("The duty of inquiry having arisen, plaintiff is charged with whatever knowledge an inquiry would have revealed."), *cert. denied*, 508 U.S. 906, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993). In addition, "[t]he data that trigger inquiry notice can come in the form of the offering materials themselves ... letters and other documents provided to limited partners by the partnership ... or public disclosures in the media about the financial condition of the

defendant and other lawsuits alleging fraud committed by the defendant." *Lenz*, 833 F.Supp. at 370 n. 7 (citations omitted).

■ "On a motion to dismiss, when the facts alleged in the complaint indicate that, with reasonable diligence, plaintiffs should have uncovered the alleged fraud prior to the limitations period, the claim will be time-barred." *Griffin v. McNiff*, 744 F.Supp. 1237, 1255 (S.D.N.Y.1990), *aff'd*, 996 F.2d 303 (2d Cir.1993) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983)); *see also Salinger*, 934 F.Supp. at 1408 ("[D]ismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings and the public disclosures themselves."); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litigation ("Integrated Resources I")*, 815 F.Supp. 620, 638 (S.D.N.Y.1993). Moreover, as one court has noted, "a court's determination that the information available to a plaintiff in a given instance should (or should not) have given him reason to consider and investigate the probability of fraud is surely warranted in appropriate cases." *In re General Dev. Corp. Bond Litig.*, 800 F.Supp. at 1136; *see also Lenz*, 833 F.Supp. at 371–72 n. 8 (collecting cases where inquiry notice decided on motion to dismiss or motion for summary judgment). Again, "[t]he plaintiffs need not be able to learn the precise details of the fraud, but they must be capable of perceiving the general fraudulent scheme based on the information available to them." *Salinger*, 934 F.Supp. at 1408. Here, plaintiffs were on inquiry notice if they should have discovered the probability that they had been defrauded from the offering materials or from the annual reports or other partnership communications, and could have discovered the general fraudulent scheme through the exercise of reasonable diligence.

### 2. Written Material Available to the Plaintiff Contradicting Alleged Misrepresentations or Disclosing Omissions Gives Rise to Inquiry Notice

The Second Circuit has not hesitated to find that contradictions between the alleged fraudulent misrepresentations and the pro-

spectus or other written partnership communications, or disclosures of information allegedly omitted, suggest the probability of fraud. For instance, in *Dodds,* a securities fraud case, the plaintiff claimed that she was fraudulently induced to invest in limited partnerships that were highly risky and illiquid. The Court held that the plaintiff was on inquiry notice of her fraud claim because the risks and illiquidity of the investments were clearly disclosed in the prospectuses. *Dodds,* 12 F.3d at 350; *see also Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 701–02 (2d Cir.1994); *Wynne v. Equilease Corp.,* No. 94 Civ. 4992, 1995 WL 764236, at *4 (S.D.N.Y. Dec.27, 1995) (holding that when "facts, transactions and events set out in the complaint as creating the cause of action are disclosed in the Offering Memorandum, as a matter of law, plaintiff reasonably discovers what he alleges as fraud at the time of investment"); *Integrated Resources III,* 851 F.Supp. at 569 ("The conflicts between the numerous oral assertions allegedly made to the Plaintiffs and the written materials received by the Plaintiffs would have alerted the ordinary investor ... that there was something amiss that should be investigated."); *Lenz,* 833 F.Supp. at 374 (duty of inquiry arose from contradiction between oral representations and partnership and subscription agreements).

In *Integrated Resources III,* the Court, addressing the timeliness of the plaintiffs' RICO claims, noted that:

> [t]he information that triggers inquiry notice of the probability of an alleged securities fraud is any financial, legal or other data available to the plaintiffs providing them with sufficient storm warnings to alert a reasonable person to the (probability) that there were either misleading statements or significant omissions involved in the sale of the (securities).

851 F.Supp. at 567 (quoting *Integrated Resources I,* 815 F.Supp. at 639). The plaintiffs in *Integrated Resources III* claimed that they relied on oral representations that the investments were safe and conservative. However, the Court found that the plaintiffs were on inquiry notice that these statements were false because the prospectuses described the risks of the investments in detail and the plaintiffs, by signing the subscription agreements, acknowledged that the limited partnerships were risky investments. *Id.* at 569. In addition, the plaintiffs claimed that the "[d]efendants misrepresented that the projections established for these investments were conservative, proper and consistent with current market conditions." *Id.* However, "the offering materials emphasized the speculative nature of the projections contained therein, discussing, for example, that the accuracy of the projections were subject to a number of conditions that were entirely outside the offeror's control." *Id.* Thus, the Court held that "[t]he conflicts between the numerous oral assertions allegedly made to the Plaintiffs and the written materials received by the Plaintiffs would have alerted the ordinary investor ... that there was something amiss that should be investigated." *Id.*

Similarly, financial data or subsequent representations that specifically expose misrepresentations or omissions by the defendant may suggest the probability of fraud. *See, e.g., Salinger,* 934 F.Supp. at 1410 ("Where the company's public disclosure reveals that a particular representation about a crucial feature of an investment has not materialized, the statute of limitations is triggered."); *Butala,* 916 F.Supp. at 318 (holding that where several events occurred that were in direct contradiction to representations made to defendants, "[a] reasonable investor would have had ample reason to investigate the status of an investment for which so much of what had been promised had not come true"); *Integrated Resources I,* 815 F.Supp. at 639 n. 8. Further, "the triggering financial data must be such that it *relates directly* to the misrepresentations and omissions the plaintiffs later allege in their action against the defendants." *Morin v. Trupin,* 809 F.Supp. 1081, 1097 (S.D.N.Y.1993) (emphasis in original). Courts in this Circuit "have held that clear evidence that an investment asset has declined in value or has been subject to an artificially inflated estimate of its value, in direct contradiction of representations made to the plaintiff at the time of sale, constitutes inquiry notice as to the probability of fraud." *Lenz,* 833 F.Supp. at 375.

In *Integrated Resources II*, some of the plaintiffs alleged that they were fraudulently lead to believe that a return of 12% could be expected. 850 F.Supp. at 1131. The Court found that the prospectus and subsequent disclosure documents put plaintiffs on inquiry notice of what later became their claims. The prospectus prohibited the use of forecasts in the offering and stated that any representation of the amount or certainty of future cash benefits from the investment by anyone connected to the offering was not permitted. *Id.* Further, 10–K statements filed by the partnerships soon after the investment showed a 7% rate of return, well below the alleged guaranteed returns of 12%. The Court stated, "As the rates of return were well below the rates the Plaintiffs alleged were guaranteed by the Prospectus, the SEC's public disclosures put them on notice of their claims as early as 1986 and no later than 1987." *Id.*

3. *Based on Written Material, Plaintiffs Were on Inquiry Notice Before November 1991 and their RICO Claims are Time–Barred.*

■ Here, plaintiffs commenced their action on November 29, 1995. Therefore, they may recover for any injury they discovered or should have discovered on or after November 29, 1991. Plaintiffs' injury occurred when they invested, *i.e.*, 1987 at the latest. Therefore, the statute of limitations began to run when plaintiffs should have been aware that there was a probability that they had been defrauded. As noted, plaintiffs allege five categories of misrepresentations or omissions as the basis for their securities fraud and mail and wire fraud predicate acts. However, prior to November 29, 1991, plaintiffs had information, from both the prospectuses and the annual reports, alerting them to almost all of defendants' alleged misrepresentations, and that they had been misled

through certain omissions. In the exercise of reasonable diligence, plaintiffs would have discovered the alleged general fraudulent scheme.

a. *The Prospectuses Put Plaintiffs on Inquiry Notice*

Several disclosures in the prospectuses should have alerted plaintiffs that they had been misled. As noted, the first group of alleged misrepresentations were oral statements that plaintiffs would receive "guaranteed" annual returns and that the investments were sure to produce long-term capital appreciation. Plaintiffs claim that defendants "guaranteed" these annual yields in two ways:

First, plaintiffs point to marketing guides for the limited partnerships, which were distributed internally to regional directors, office managers and account executives, for office use only and not for distribution to investors. For example, the guide for MLHIRP IV states that "[c]ash distributions will be paid semi-annually ... beginning at an expected rate of approximately 7% per annum with a cumulative cash flow make-up." (Compl.¶ 118) [2] Thus, the marketing guides contained statements that the *expected* return would *approximate* a certain level, with the possibility that if the return was not reached, the investor would receive priority returns out of the sale or financing proceeds. Plaintiffs claim that defendants' salesmen orally communicated these expectations regarding "guaranteed" annual yields.

Second, plaintiffs claim that the prospectuses for the limited partnerships reinforced the impression that specific annual yields were guaranteed. Plaintiffs point to statements in the prospectuses that investors "would receive priority distributions of sales and financing proceeds" of the limited partnerships. (*Id.* ¶ 117) For example, plaintiffs

---

**2.** The other MLHIRP marketing guides contained similar statements. For example, the MLHIRP II marketing guide provided, "It is anticipated that distributable cash will approximate 9% initially; however, the Managing General Partner expects that this percentage will increase over time." (Pl.Ex. D–3 at 96853) The MLHIRP V marketing guide provided, "Our objective is to begin with a rate of approximately

7% per annum with a cumulative cash flow make-up of 10%." (Pl.Ex. D–6 at 93989) The MLHIRP VI marketing guide provided, "Once the proceeds are fully invested in properties, our objective is to begin with a rate of approximately 6% per annum, depending on market or other factors. There is a cumulative cash flow make-up of 9%." (Pl.Ex. D–8 at 96989)

point to a section from the MLHIRP V prospectus titled "Unit Holders Share of Sale or Financing Proceeds":

Sale or Financing Proceeds will be distributed to the Unit Holders (after payment of the General Partners 2% carried interest in Sale or Financing Proceeds) until they have received a return of their Capital Contributions, plus cumulative distributions of Distributable Cash and Sale or Financing Proceeds equal to 7% per annum of their Adjusted Capital Contributions. Thereafter, 85% of any remaining Sale or Financing Proceeds will be distributed to the Unit Holders after the General Partners receive an amount which will not exceed 2% of sale proceeds received. The General Partners will not receive any Sale or Financing Proceeds (except for their 2% carried interest in Sale or Financing Proceeds) unless the Unit Holders have received a return of their Capital Contributions plus cumulative distributions of Distributable Cash and Sale or Financing Proceeds equal to 10% per annum of their Adjusted Capital Contributions.

(*Id.* ¶ 101) The other prospectuses contained similar provisions relating to the distribution of Sale or Financing Proceeds which provided that any such proceeds would be distributed so as to give the limited partners priority return up to a certain percentage. (*Id.*) Plaintiffs claim that these sections reinforced the salesmen's statements, based on the marketing guides, that plaintiffs were guaranteed certain yields. Specifically, plaintiffs claim that the "guaranteed" yields for each limited partnerships were: MLH Prop I–III—6%; MLHIRP I—8%; MLHIRP II—9%; MLHIRP III—8.5%; MLHIRP IV—7%; MLHIRP V—7%; MLHIRP VI—6%. (*Id.* ¶ 117)

However, the prospectuses, in clear terms, contradicted these alleged "guarantees." The prospectuses contained several prominent warnings regarding distributions and long-term capital appreciation. On the first page and again in the "Summary of the Offering" section, the prospectuses stated, in relation to the objectives of "realiz[ing] current cash distributions derived from property rentals and interest income, obtain[ing] capital appreciation from the proceeds of the sales of the property interests, and preserv[ing] and protect[ing] the Partnership's capital", that "[t]here can be no assurance that the foregoing investment objectives will be attained." (*See, e.g.,* Def.Ex. 1 at 1; *see also* Compl. ¶ 107) In other words, the prospectuses stated that there were no guarantees.

Moreover, the prospectuses gave specific warnings as to distributions and capital appreciation: "There can be no assurance that Limited Partners will receive Distributable Cash in any amount" (Def.Ex. 6–MLH Prop. I at 41; *see also* Def.Ex. 1 at 39; Def.Ex. 6–MLH Prop. II at 44, MLH Prop. III at 38, MLHIRP I at 32, MLHIRP II at 29, MLHIRP III at 33, MLHIRP IV at 39–40, MLHIRP V at 40) and

[t]he attainment of the Partnership's goals will depend on many factors, principally the ability of the Managing General Partner to select suitable properties for investment and the successful management of their operations. The objective of capital appreciation, in particular, may not be achieved since it is predicated on certain assumptions as to the real estate market in general and the future values of particular properties which are not now ascertainable. Poor market conditions may from time to time affect some portions of the real estate market and may prevent or postpone the attainment of this objective until and unless there is an improvement in such portions of the real estate market. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE FOREGOING OBJECTIVES WILL BE ATTAINED.

(Def.Ex. 6–MLHIRP I at 24; *see also* Def. Ex. 1 at 31–32; Def.Ex. 6–MLH Prop. I at 27, MLH Prop. II at 34, MLH Prop. III at 23, MLHIRP II at 23, MLHIRP III at 26–27, MLHIRP IV at 31, MLHIRP V at 32) (emphasis in original)

This particular statement dispelled any ambiguity in the prospectuses' statements regarding the priority of distribution of sale or financing proceeds. Plaintiffs claim that they interpreted these priorities in the distribution of sale or financing proceeds as "guarantees." However, this statement, that no

such proceeds were guaranteed, should have put them on notice that there was no guarantee that there would even be any sale or financing proceeds to distribute, and therefore, that the statements in the prospectuses relating to the distribution of these proceeds were not guarantees but merely information on priority of distributions.

Further, the prospectuses each contained a section entitled "Risk Factors," which provided in part, "There are certain risks inherent in ownership of real property which may cause fluctuations in occupancy rates, rent schedules and operating expenses.... There can be no assurance of profitable operations because the cost of operating properties may exceed the gross rental income therefrom ...." (*See, e.g.,* Def.Ex. 6–MLHIRP I at 14) The section continued: "There can be no assurance, therefore, that the properties ultimately to be acquired by the Partnership will meet all of the investment objectives of the Partnership ...." (*Id.* at 17) Therefore, to the extent that plaintiffs claim to have received assurances of guaranteed yields and capital appreciation, and to have been misled by statements relating to the safety of the investments, they should have been aware from the prospectuses that these guarantees and assurances were fraudulent, especially in light of the prospectuses' exhortation on their back cover that representations outside the prospectuses were not to be relied upon.

The second category of alleged misrepresentations or omissions is that defendants represented that they would not receive fees unless the limited partners received their full priority returns. However, the prospectuses contained information which contradicted this alleged representation. The prospectuses disclosed in great detail the fees and commissions that defendants would receive. The prospectuses stated in clear language that the general partners would receive some commissions before the limited partners received their annual yield and were able to recover their capital. For example, the MLHIRP IV prospectus stated that defendants would receive: 1) selling commissions ranging from 2% to 8% on sales of limited partnership units; 2) acquisition fees of 1% of the gross proceeds of the offering "as compensation for finding, analyzing, structuring and negotiating suitable property investments"; 3) 2% of "Distributable Cash"; and 4) 2% of the Sale or Financing Proceeds, plus 15% of proceeds remaining after the Unit Holders have received their capital contribution and their priority return. (Def.Ex. 6–MLHIRP IV at 8–9) The prospectuses should have put plaintiffs on inquiry notice that alleged statements regarding defendants' compensation were fraudulent. *See, e.g., Integrated Resources III,* 851 F.Supp. at 568–69.

As to the third category of representations or omissions—that defendants failed to disclose that distributions to prior partnerships consisted of returns from non-real estate investments and return of capital—the prospectuses contained information which clarified the source of distributions for prior limited partnerships. Plaintiffs allege that defendants failed to disclose that "returns from proceeds not invested in real estate or returns on investor cash were being used to inflate the purported 'on-track' performances of the previously sold Partnerships." (Compl.¶ 109) The Complaint gives one example:

> During each of 1985 and 1986 ... Defendants paid investors in MLHIRP IV distributions of $70 per unit. While it was represented that the source of these distributions was cash from operations, which investors were led to believe came from real estate investments, these distributions were in fact funded in large part by a return of investors' original cash contributions, which had not been invested in real estate, as well as by an unexplained waiver of distributions to the General Partner in 1985. Thus, Defendant used investors' capital contributions to inflate the apparent success of MLHIRP IV as they sold MLHIRP V and MLHIRP VI.

(*Id.* ¶ 110) The only specific misleading statements that plaintiffs point to relating to the prior limited partnerships are in the marketing guides. For instance, the complaint quotes from the MLHIRP IV guides, which provided: "The strong performance of our prior partnerships should help you counter client reservations resulting from recent un-

favorable press on syndications"; and "To date, limited partners [MLHIRP II] have received the projected cash distributions of 9 percent per annum .... To date, limited partners [MLHIRP III] have received the projected cash distributions of 8.5 percent." (*Id.* ¶ 119)[3]

However, the prospectuses referred investors to attached tables which contained detailed historical financial information on prior limited partnerships, and which detailed the source of their annual distributions. These tables showed distributions on a "GAAP basis," as stemming from either "Investment Income" or "Return of Capital," and on a "cash basis," as stemming from either "Operations" or "Reserves." For example, the MLHIRP VI prospectus lists which part of the MLHIRP I distributions for 1982 to 1985 represented "investment income" or "operations" and which part came from "return of capital" or "reserves." (Def.Ex. 1 at 100–102) To the extent that plaintiffs claim to have been misled by omissions relating to the source of the distributions to prior partnerships, that information was included in the prospectuses, and plaintiffs were on inquiry notice of the source of the prior partnerships' distributions.

Moreover, the prospectuses revealed other information relating to the source of partnership distributions which plaintiffs claim was omitted. The prospectuses for MLHIRP V and VI, which were the only limited partnerships for which substantial data on the performance of prior limited partnerships existed, revealed that "[a]s a result of the fact that in some cases the general partners of the partnerships have waived and/or deferred portions of cash distributions ... to which they were entitled, cash distributions to investors have been greater than if such general partners had taken their full cash distributions and reimbursements." (Del.Ex. 1 at 103; *see also* Def, Ex. 6–MLHIRP V at 114) In addition, the MLHIRP VI prospectus stated,

> For certain fiscal years ... [operations income] were insufficient to fully fund cash

distributions paid for such years.... The difference was funded from reserves established from investor capital contributions (which do not represent a return from investment) and/or reserves attributable to undistributed cash flow from prior years) [*sic*]. It is anticipated that cash from operations for 1986 fiscal semi-annual periods for most or all of such partnerships will be insufficient to fully fund cash distributions to investors for such periods at the same levels as in prior periods. If and to the extent that the partnerships determine to continue to make distributions at the same levels as in the past, a portion of such distributions is expected to be funded from reserves (in most cases) established from investor capital contributions.

(Def.Ex. 1 at 103–04)

Plaintiffs' only response to these clear disclosures of allegedly omitted material is that the phrase "Return of Capital" is undefined in the prospectuses and that "there is no indication that the cash distribution specified would be considered a reduction in the capital contribution of the limited partner." (Pl. Mem. at 37) However, "Return of Capital" is a term that should be familiar to an ordinary investor. Also, to the extent that plaintiffs claim that defendants' statements that the prior limited partnerships had received distributions of certain amounts were misleading, these tables and other statements should have alerted the ordinary investor either that not all of the distributions from prior limited partnerships were from real estate investments, or that he should inquire as to the source of these distributions.

The fourth category of alleged misrepresentations or omissions—that defendants did not disclose the actual percentage returns necessary to meet their objectives—is facially flawed. Any reasonable investor would be aware that real estate investments have operating costs and therefore that the limited partnerships would have to achieve returns higher than the allegedly guaranteed annual distributions to meet their objectives. The failure to include specific estimates was not

---

**3.** The MLHIRP VI marketing guide does not contain such statements relating to prior limited

partnerships. (Pl.Ex. D–8 at 97000–06).

misleading, especially in view of the specific warnings noted above relating to possible fluctuations in operating expenses. *See supra* at 31–32. Moreover, even if failing to disclose these required returns was misleading, the prospectuses' specific disavowals of any guarantees that the limited partnerships would meet their objectives made such disclosure unnecessary.

As for the fifth category, the prospectuses did not disclose that reserves of more than two percent would remain uninvested in real estate. However, as demonstrated below, disclosures in the annual reports alerted plaintiffs to this alleged omission.

Finally, as to any claim relating to defendants' manipulation of the secondary market to create an aura of liquidity, the prospectuses and subscription agreements put plaintiffs on notice that there would not be a secondary market in limited partnership units. The prospectuses disclosed that "no market is expected to exist in which the Units can be traded" (*see, e.g.,* Def.Ex. 6–MLHIRP I at 1, 16), and the subscription agreements provided that "the undersigned understands and recognizes that ... there will be no public market for the Units." (*See, e.g.,* Def.Ex. 3–MLHIRP I at 105)

### b. *The Annual Reports Put Plaintiffs on Inquiry Notice*

If the prospectuses did not place plaintiffs on inquiry notice, the annual reports for the limited partnerships contained information that should have raised warnings with regard to the first and fifth categories of alleged misrepresentations or omissions. As to the first category—the alleged guaranteed annual distributions and long-term capital appreciation—each annual report contained information on the amount and source of distributions to investors and the remaining net

asset value of each partnership unit. Despite the alleged guarantees of annual yields discussed above, the 1987 distributions, as a percentage of the initial investment, were as follows: MLH Prop. I—2.8%; MLH Prop. II—1%; MLH Prop. III—1%; MLHIRP I—2%; MLHIRP II—3%; MLHIRP III—3%; MLHIRP IV—5%; MLHIRP V—5%; and MLHIRP VI—5%. The 1988 distributions were no better: MLH Prop. I—3%; MLH Prop. II—.7 %; MLH Prop. III—.7%; MLHIRP I—2%; MLHIRP II—3%; MLHIRP III—2.7%; MLHIRP IV—4.7%; MLHIRP V—5%; and MLHIRP VI—5%. These were well below the "guaranteed" annual yields ranging from 6% to 9% and suggested the probability that the "guaranteed" annual yields were a misrepresentation.

Moreover, plaintiffs were on notice of a precipitous drop in the partnerships' net asset values which suggested strongly that long-term capital appreciation was unlikely. The annual reports provided the net asset value of each limited partnership unit, which reflected the independently appraised value per unit of the limited partnership's portfolio of real estate investments and other assets, less liabilities.[4] The annual reports provided also the sum of the cumulative amount of cash distributions and the net asset value, which represented the total value of an individual partnership unit. To take two examples, for MLHIRP II, the net asset value of an initial $1000 unit was: $850 in 1986, $807 in 1987, $629 in 1988, $581 in 1989, and $550 in 1990. Further, the total value of the investment, *i.e.,* the cumulative cash distributions plus the net asset value, was: $1105 in 1986, $1142 in 1987, $1159 in 1988, $1136 in 1989, and $1130 in 1990. (Def. Ex. 4–MLHIRP II) Thus, instead of appreciating in value, the net asset value dropped 40–50%,

---

4. All the annual reports contained language similar to the following:

> Investors should be aware that appraised values represent the opinion of the appraiser as of the date of the appraisal and are based on facts and conditions existing on the date of the appraisal and on a number of assumptions concerning future circumstances, which assumptions may or may not prove to be accurate. Property values fluctuate in response to many factors, including local real estate market conditions, interest rate levels, inflation expectations, and rates of return available on alternative investments. Therefore, the current fair market value of the properties is probably different from the appraised value, and these properties, if they were sold, might be sold for a higher or lower price than their appraised values.

(Def. Ex. 4—MLHIRP I, 1986 Annual Report at 6)

and instead of achieving a total value that would reflect the guaranteed 9% annual return plus long-term capital appreciation, the partnership units rose in total value only $130 in seven years since the closing in 1983, for a total gain of 13%. For MLHIRP IV, the net asset value of an initial $1000 unit was: $906 in 1986, $928 in 1987, $768 in 1988, $722 in 1989, and $644 in 1990; the total value of the investment was: $1157 in 1988, $1154 in 1989, and $1120 in 1990. (*Id.* MLHIRP IV) Again, instead of appreciating in value, the net asset value dropped 30–40%, and instead of achieving a total value that would reflect the guaranteed 7% annual return plus long-term capital appreciation, the partnership units rose in total value only $120 in six years since the closing in 1984, for a total gain of 12%.[5]

The annual reports belie plaintiffs' contention that they "could not have known that the value of their Partnership interests was substantially less than they were previously led to believe" until 1992, when defendants wrote down losses on the limited partnerships' financial statements. (Pl.Mem. at 76) The annual reports contained clear language showing a precipitous drop in the value of the investments, whether reflected in the balance sheet or not, and plaintiffs were on inquiry notice that the alleged promised yields and capital appreciation were way off, and probably fraudulent. Because plaintiffs' fraud allegations are based substantially on the alleged misrepresentations of "guaranteed" annual yields and long-term capital appreciation, the decline in the annual returns and in the net asset value of the investment at least raised a duty of inquiry as to the fraud and, together with the statements in the prospectuses, should have been received as urgent warnings of fraud. *See, e.g., Farr v. Shearson Lehman Hutton, Inc.,* 755 F.Supp. 1219, 1226 (S.D.N.Y.1991) ("While in certain cases, the mere fact that an investment's value declines sharply may not by itself put an investor on notice of fraudulent statements or omissions in a prospectus, ...

here it is the 'mere fact' of the decline in value which forms the basis of plaintiff's claim.").

As for the fifth category of alleged misrepresentations or omissions—defendants' failure to disclose their intention to keep large cash reserves, uninvested in real estate, in order to supplement any shortfalls in income from the real estate investments and thereby keep limited partner distributions at the promised levels—the 1986 annual reports for all of the MLHIRP limited partnerships, except MLHIRP VI, provided notice that uninvested capital reserves were being used to supplement distributions. For example, the MCHIRP V 1986 annual report stated:

> On a cumulative basis, cash generated from operations was insufficient to fully fund distributions to investors.... The difference between distributions to investors and cash generated from operations was funded from reserves established from investor capital contributions and to that extent represented a return to investors of a portion of their capital contributions.

(Def. Ex. 4–MLHIRP V) Moreover, plaintiffs concede that the MLHIRP VI prospectus stated:

> In connection with the acquisition of such properties, the Managing General Partner may increase reserves, as needed, to augment for a time (the first three to five years or longer of the property's holding period, depending upon lease expiration dates) the Partnership's cash flow from operations so that the Partnership can continue to make cash distributions at initially anticipated levels, and to pay for some capital improvements and lease-up expenses for these properties. To the extent that reserves so distributed consist of offering proceeds, the amount of gross offering proceeds available for investment in properties will be reduced.

(Compl.¶94) These statements alerted plaintiffs to facts that were allegedly omitted from the offering material—the maintenance of re-

---

**5.** Although the net asset values of MLHIRP V and VI had not plummeted as far as the other limited partnerships by 1991, and the total values were not as low, the contradictions between the alleged misrepresentations or omissions and the prospectuses, especially the explicit disclosures regarding the source of the distributions for the earlier limited partnerships, raised the probability of fraud and put plaintiffs on inquiry notice as a matter of law.

serves invested in non-real estate investments and the return of capital to boost distributions—and that form the basis for plaintiffs' fraud claims. Plaintiffs were therefore on inquiry notice.

Because the prospectuses and subsequent partnership communications, including the annual reports, alerted plaintiffs to the falsity of all the claimed representations, and informed plaintiffs of all the alleged omissions, plaintiffs were on inquiry notice at least by 1990 of the probability of the fraud they charge in connection with the offering of the limited partnerships. Accordingly, the statute of limitations began to run when plaintiffs received those documents and were on inquiry notice, and plaintiffs' claims are time-barred.

Plaintiffs' reliance on *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F.Supp. 68, 76–77 (S.D.N.Y.1996) is misplaced. That case is distinguishable because those plaintiffs never received annual reports which placed them on inquiry notice of the fraud. Rather, they received only account statements which reflected the par value, and not the true value, of the investments. The Court found that the investors did not learn of the capital losses which signaled the fraud until the account statements were altered to reflect the true value of the investments. *Id.* at 77. Here, the annual reports clearly disclosed the capital losses and the fraudulent nature of defendants' alleged statements and omissions.

### 4. *Fraudulent Concealment*

■ Plaintiffs do not contend that reasonable diligence, in the absence of any concealment by defendants, would not have revealed the general fraudulent scheme. Rather, they claim that defendants concealed their fraud by actively misrepresenting that the declines in the partnerships' asset values and distributions were the result of short-term declines in the real estate market and the long-term nature of the investments. Plaintiffs claim that such fraudulent concealment excused any inquiry, or at least justified the delay in bringing suit. Thus, plaintiffs argue that even if the prospectuses and annual reports put them on inquiry notice, the statute of limitations was tolled.

■ The Second Circuit has held that the "standard tolling exceptions apply" to civil RICO actions. *Bankers Trust*, 859 F.2d at 1105. "Under the doctrine of fraudulent concealment, the statute of limitations will be tolled if the plaintiff proves three elements: (1) wrongful concealment by the defendant, (2) which prevented the plaintiff's discovery of the nature of the claim within the limitations period, and (3) due diligence in pursuing discovery of the claim." *Butala*, 916 F.Supp. at 319. Courts have held that all three elements of the fraudulent concealment doctrine are subject to Fed.R.Civ.P. 9(b)'s particularity requirements. *See Butala*, 916 F.Supp. at 319–20; *Bilick* v. *Eagle Elec. Mfg. Co.*, 807 F.Supp. 243, 255 (E.D.N.Y.1992); *Kozonasky* v. *Sears Roebuck & Co.*, No. 81 Civ. 2164, 1986 WL 12528, at *4 (S.D.N.Y. Oct.27, 1986).

Accordingly, contrary to plaintiffs' contention, plaintiffs must demonstrate reasonable diligence even if defendants engaged in active concealment. The Supreme Court has clarified recently that even when a plaintiff pleads active concealment by the defendant, the plaintiff must still demonstrate that he exercised due diligence in trying to discover the fraud. *See Klehr* v. *A.O. Smith Corp.*, 521 U.S. 179, 117 S.Ct. 1984, 1993, 138 L.Ed.2d 373 (1997).

To prove reasonable diligence sufficient to permit a finding of fraudulent concealment, a plaintiff must do more than merely inquire as to the status of the investment or simply rely on reassurances by the defendant. As one Court in this District has noted: "Neither reassurances accompanying the relevant notice nor the continued failure to disclose the facts allegedly misrepresented in the first place, relieves the plaintiff of his duty to undertake reasonable inquiry or tolls the statute of limitations." *Integrated Resources II*, 850 F.Supp. at 1123; *see also Butala*, 916 F.Supp. at 319; *Integrated Resources III*, 851 F.Supp. at 568; *Lenz*, 833 F.Supp. at 376 n. 12. "Thus, once placed on inquiry notice, a limited partner cannot avoid the duty to inquire by relying on reassurances and optimistic statements made by the partnership."

*Integrated Resources I,* 815 F.Supp. at 640; *see also In re JWP Inc. Sec. Litig.,* 928 F.Supp. 1239, 1248 (S.D.N.Y.1996) ("The plaintiff may not avoid her duty to inquire merely by relying on reassuring statements that management made in conjunction with the information that placed plaintiff on notice or on management's continued failure to disclose the truth behind the allegedly misrepresented facts.").

Further, once a plaintiff becomes aware of direct contradictions between the defendant's representations and other materials available to the plaintiff, "plaintiffs [are] thereby left with reason to be suspicious of defendant, [and] it [is] no longer reasonable for them to defer to [the defendant's] representations." *Addeo v. Braver,* 956 F.Supp. 443, 451–52 (S.D.N.Y.1997); *see also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 218 (4th Cir.1987) ("To permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct upon this sort of timid inquiry would effectively nullify the statute of limitations.... 'Fraudulent concealment' implies conduct more affirmatively directed at deflecting litigation than that alleged here; and 'due diligence' contemplates more than the unpursued inquiry allegedly made by [plaintiff]."); *Teichner v. PaineWebber Inc.,* No. 97 Civ. 1766, 1997 WL 328069, at *2 (S.D.N.Y. June 13, 1997); *Golub v. Tesler,* No. 93 Civ. 1977, 1995 WL 234884, at *3 n. 1 (S.D.N.Y. Apr. 20, 1995).

Here, plaintiffs' allegations of reasonable diligence are contained in two paragraphs of the Complaint:

150. Plaintiffs and the Class exercised due diligence when making and reviewing their investments in the Partnerships by:

—Relying on the sales presentations used by Defendants;

—Relying on sales materials;

—Consulting with and relying upon Defendants' registered representatives concerning the Partnerships; and

—Relying on written communications about the Partnerships, including communications from MLH and the general partners about the status of the Partnerships.

151.... Defendants discouraged Plaintiffs and the Class from making inquiries prior to the sale and financing stages of the Partnerships.

(Compl.¶¶ 150–51)

These allegations, even if believed, fail to demonstrate the reasonable diligence necessary to establish fraudulent concealment. Plaintiffs cannot satisfy their duty of reasonable diligence merely by reading information they receive from defendants and relying on defendants' reassurances when they have reason to believe they are probably the victims of fraud. Merely accepting defendants' reassurances regarding the state of the real estate market does not constitute diligent inquiry. Plaintiffs do not even allege that they made any specific inquiries of defendants, let alone detail when such inquiries were made, to whom, regarding what, and with what responses. Plaintiffs' hazy allegation that they consulted with defendants' registered representatives is silent as to time and place, and discloses nothing about the content of the consultation. Further, plaintiffs were aware of facts placing them on inquiry notice of the misrepresentations or omissions, and they have failed to plead adequately that as a result of defendants' alleged concealment, they could not, through reasonable diligence, have discovered the fraud. Because plaintiffs have failed to plead reasonable diligence, their claim of fraudulent concealment fails. Accordingly, the statute of limitations began to run when plaintiffs were put on inquiry notice, the statute of limitations was not tolled, and plaintiffs' RICO claims are time-barred and must be dismissed.

5. *Plaintiffs' Motion to Convert the Motion To Dismiss Into a Motion For Summary Judgment and to Obtain Further Discovery*

■■■ Plaintiffs move to convert defendants' motion to dismiss into a motion for summary judgment, and ask also that resolution of the motion for summary judgment be delayed until they can obtain further discovery related to defendants' knowledge of the partnerships' inability to meet defendants'

guarantees at the closing of the partnerships, and to defendants' fraudulent concealment of facts underlying the fraud. (Chimicles Decl. ¶¶ 7–11, 17, 19)

This motion is denied because as noted, defendants are entitled to dismissal based on the pleadings and those documents that may be considered on a motion to dismiss. Further, the requested discovery would not alter the resolution of this motion. Plaintiffs were on inquiry notice of the alleged fraud from the information available to them and the statute of limitations began to run at that time. Moreover, even if the requested discovery would create an issue of fact as to whether defendants fraudulently concealed their fraud, this would not change the fact that plaintiffs have failed to allege adequately the exercise of reasonable diligence in attempting to uncover the fraud. Information relating to plaintiffs' diligence in investigating the alleged fraud is within plaintiffs' exclusive possession; they do not need discovery to reveal it. Knowing that information, plaintiffs made only the inadequate allegations discussed above.

Further, plaintiffs argue that they "would object if the Court dismisses the Complaint based on Defendants' factual interpretation of [the documents submitted by defendants], without an opportunity to demonstrate that such interpretations are not only improper but incorrect." (Reply Mem. in Support of Motion to Convert Motion for Summary Judgment at 2) However, the result here is based on a finding that an objective interpretation of the documents available to plaintiffs should have placed them on inquiry notice, an issue which plaintiffs had an opportunity to argue in response to this motion. Whether the facts underlying these documents were true or not, and whether other documents exist which demonstrate fraudulent concealment, does not affect whether a duty of inquiry arose.

### 6. Dismissal With Prejudice

As noted above, plaintiffs have had three opportunities to allege a viable claim. When plaintiffs elected to amend their complaint in response to defendants' first motion

to dismiss, I warned them that I would consider the Second Amended Complaint their final pleading, and likely would not grant leave to amend were that complaint dismissed. As plaintiffs' highly experienced counsel surely are aware, pleading is not an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges. Rather, plaintiffs have the responsibility to plead their case adequately, without defendants' or the Court's assistance. This they have failed to do three times, and they were warned that this was their final opportunity. A court may deny a plaintiff leave to replead when that party has "has been given ample prior opportunity to allege a claim." De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 72 (2d Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996); see also Mooney v. Vitolo, 435 F.2d 838, 839 (2d Cir.1970) ("Plaintiffs here were twice given an opportunity to replead. Therefore, it was within the sound discretion of the District Court to deny leave to replead on the third attempt."). Accordingly, defendants' motion to dismiss plaintiffs' RICO claims is granted, and plaintiffs are denied leave to replead.[6]

### III.

Now that the federal claims have been dismissed, there remains the issue of whether federal jurisdiction exists over the remaining state claims. Plaintiffs have not alleged diversity jurisdiction. Jurisdiction over the state law claims is therefore supplemental, and retention of jurisdiction over them is discretionary. 28 U.S.C. § 1367(c)(3) (1994); Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir.1994). When deciding whether to retain supplemental jurisdiction over state law claims, courts consider judicial economy, the relationship between the dismissed and remaining claims, comity, and fairness to the litigants. See, e.g., Castellano v. Board of Trustees, 937 F.2d 752, 758 (2d Cir.), cert. denied, 502 U.S. 941, 112 S.Ct. 378, 116 L.Ed.2d 329 (1991). "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed

---

**6.** Because I dismiss plaintiffs' RICO claims on statute of limitations grounds, I need not address defendants' other arguments relating to these claims.

as well." *United Mine Workers of Amer. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *see also Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining jurisdiction over the remaining state-law claims."); *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir.1994); *Castellano*, 937 F.2d at 758. Therefore, I decline to exercise supplemental jurisdiction. Plaintiffs' state law claims are dismissed for lack of jurisdiction.

\* \* \* \* \* \*

For the reasons set forth above, defendants' motion to dismiss plaintiffs' RICO claims is granted, leave to replead is denied, and plaintiffs' state claims are dismissed for lack of subject matter jurisdiction.