CSI INVESTMENT PARTNERS
II, L.P., et al., Plaintiffs,

v.

CENDANT CORPORATION,
et al. Defendants.

No. 00 CIV. 1422 (DAB)(DFE).

United States District Court,
S.D. New York.

March 29, 2001.

Sean F. O'Shea, Esq., New York City.

Michael H. Gruenglas, Esq., Skadden, Arps, Slate, Meagher & Flom, LLP, New York City.

Daniel J. Beller, Esq., Paul, Weiss, Rifkind, Wharton & Garrison, NY.

### ADOPTION OF REPORT AND RECOMMENDATION

BATTS, District Judge.

This matter is before the Court upon the October 31, 2000 Report and Recommen-

dation of United States Magistrate Judge Douglas F. Eaton The parties have not filed objections.[1]

Having reviewed the Report and Recommendation and finding no clear error on the face of the record, *see* Rule 72, Fed. R.Civ.P., Notes of Advisory Committee on Rules (*citing Campbell v. United States Dist. Court,* 501 F.2d 196, 206 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974)), it is hereby

ORDERED AND ADJUDGED as follows:

1. The Report and Recommendation of United States Magistrate Judge Eaton dated October 31, 2000 be and the same hereby is approved, adopted, and ratified by the Court;

2. The Motions to Dismiss submitted by Defendants Cendant and Lipton are GRANTED on the basis that Plaintiffs' Section 10(b) claim, as set forth in the first cause of action, is time barred, insofar as it alleges fraud based on non-disclosure of the accounting irregularities.

3. The Motions to Dismiss are also GRANTED on the basis that Plaintiffs' Section 10(b) claim, also set forth in the first cause of action, fails to meet the requirements of Fed.R.Civ.P. 9(b), insofar as it alleges fraud based on misrepresenta-tions and omissions concerning Cendant's intentions.

4. Defendant Lipton's request for a stay of the proceedings in this Court is DENIED.

5. Plaintiff is hereby granted leave to file an Amended Complaint upon the conditions stated in the Report and Recommendation and as outlined at pages 31–32. Should Plaintiff elect to file an Amended Complaint, mindful of the constraints imposed by Fed.R.Civ.P. 11, the Amended Complaint shall be filed within twenty (20) days of the date of this Order. Defendants shall move against or answer any Amended Complaint within twenty (20) days of service of said Complaint.

Should the parties elect to proceed before Magistrate Eaton for all purposes, they are directed to return the enclosed consent form pursuant to 28 U.S.C. § 636(c) within ten (10) days of the date of this Order.

SO.ORDERED.

### REPORT AND RECOMMENDATION TO JUDGE BATTS

EATON, United States Magistrate Judge.

### TABLE OF CONTENTS

PAGE

Preliminary Statement ..................................................... 448
ALLEGED FACTS ........................................................... 450
LEGAL ANALYSIS .......................................................... 451
 1. The Federal Statute of Limitations on the Non–Disclosure of the Accounting
 Irregularities ......................................................... 451
 2. Misrepresentations about Cendant's Intentions ............................ 451
 a. Intention Not To Perform the Contract ................................ 452
 b. Pre–Closing Oral Misrepresentations ................................. 454
 c. Statute of Limitations .............................................. 456

---

1. The Court notes that on November 14, 2000 the Court granted Plaintiffs a ten (10) day extension within which to make objections to the Report and Recommendation. However, no objections were filed.

PAGE

 d. A Summary of Problems with the Fraud Claim Based on Cendant's
 Intentions ............................................................. 457
 3. Plaintiffs' Argument that They Suffered No Injury until May 1999 .............. 457
 4. Plaintiffs' Argument for Equitable Tolling ..................................... 462
 5. Lipton's Argument about the Merger Clause ................................... 463
 6. Lipton's Request for a Stay of Federal Court Proceedings ...................... 463
SUMMARY AND RECOMMENDATION ..................................................... 464

### Preliminary Statement

The complaint asserts a Section 10(b) securities fraud claim and related state-law claims against Cendant Corporation, Cosmo Corigliano (Cendant's former Chief Financial Officer), Amy Lipton (a former Deputy General Counsel of Cendant) and 100 unnamed defendants in connection with the purchase by Cendant, from Plaintiffs, of the capital stock of Credentials Services International, Inc.

Defendants Cendant and Lipton have filed separate motions to dismiss on the ground that the sole federal-law claim is barred by the federal statute of limitations. Lipton's motion asserts two additional grounds: (a) that the complaint fails to allege fraud with the specificity required by Rule 9(b), F.R.Civ.P., and (b) that the misrepresentations ascribed to Lipton are barred by a merger clause in the Purchase Agreement. Lipton's motion also requests that, if the complaint is not dismissed, the proceedings in this Court be stayed pending resolution of the parallel proceedings in state court. On July 31, 2000, Judge Batts referred both motions to me. For the reasons set forth below, I conclude that:

(1) Plaintiffs' federal-law claim, insofar as it is based on non-disclosure of massive accounting irregularities, is barred by the federal statute of limitations.

(2) The federal-law claim, insofar as it is based on misrepresentations about Cendant's intentions concerning its post-acquisition operation of Credentials, is not pleaded with the specificity required by Rule 9(b).

The second theory may or may not state a Section 10(b) claim with the filing of a more specific complaint. This issue cannot be determined at the present stage of the proceedings. I recommend that Judge Batts permit Plaintiffs to serve an amended complaint in strict compliance with Rule 9(b). At that point we will be in a better position to see whether any portion of the federal claim can survive.

### ALLEGED FACTS

In considering a motion to dismiss, the court assumes the truth of Plaintiffs' allegations. The following statement of facts is culled from the complaint and the documents it incorporates by reference. (Citations, unless otherwise identified, are to paragraphs of the complaint; "Exh. A" refers to the Stock Purchase Agreement attached as Exhibit A to the complaint.)

Cendant, a large conglomerate, was created by the December 1997 merger of HFS, Inc. and CUC International, Inc. ¶ 15. Also in December 1997, Cendant entered into negotiations with Plaintiffs for the purchase of Credentials, which was engaged in a business (selling club memberships) similar to the business of Cendant's Comp–U–Card division ("CUC"). ¶¶ 15, 23, 37, 38. Defendants Corigliano and Lipton led the negotiations for Cendant. ¶ 81.

The resulting Stock Purchase Agreement ("Purchase Agreement") provided for a purchase price of $125 million (less certain deductions), plus a contingent amount. The Contingent Payment would depend on

the number of Net New Memberships (in excess of a defined Membership Threshold Amount) that were added to Credentials' membership base during the calendar year 1998. Promptly following March 1999, Cendant was required to deliver to Plaintiffs (a) a certificate providing specified information concerning new memberships, and (b) the first Contingent Payment, if any, payable by Cendant.[1] ¶¶ 43, 45, 50.

Cendant's marketing obligations with respect to Credentials' business were set forth in Section 5.11 of the Purchase Agreement:

> SECTION 5.11 *Marketing Efforts.* During the period from the Closing Date until December 31, 1998, Cendant will use reasonable commercial efforts to cause the products of the Company [Credentials] to continue to be marketed substantially in accordance with the general historical practices of Cendant's Comp–U–Card division for marketing products similar to those offered by [Credentials], it being understood that Cendant shall not be deemed to be in breach of this Section 5.11 as a result of any change in such marketing practices that in Cendant's good faith judgment is necessary to comply with applicable law (including any changes in law) or the requirements of third parties under any Material Agreement described in Section 3.1(p)(ii) hereof or that is consistent with changes in the general marketing practices of the industry in which [Credentials] competes.

¶ 52; Exh. A, § 5.11.

Initially, the parties had contemplated that the price for the stock of Credentials would be about $170 million, to be paid at the closing. Cendant suggested making a portion of the purchase price contingent upon the future performance of Credentials' business, which would be highly dependent on the resources and efforts devoted by Cendant. ¶¶ 3, 40. Plaintiffs agreed to the Contingent Payment, in reliance on (a) Cendant's greater resources, (b) Cendant's contractual obligations under Section 5.11, and (c) Defendants' representations as to Cendant's aggressive plans to grow Credentials' membership base. ¶¶ 3, 41, 51, 54, 55. Prior to the contract, Plaintiffs had projected 2 million Net New Memberships for 1998. With the added resources of Cendant, Plaintiffs expected at least an additional 1 million Net New Memberships, which would result in a Contingent Payment of at least $50 million. ¶ 44.

A few days prior to the closing, defendants Corigliano and Lipton and another high-level executive resigned from Cendant. ¶¶ 61, 81(c). However, Cendant assured Plaintiffs that the resignations were not connected to the acquisition of Credentials and that the acquisition would go forward. ¶ 61.

The Purchase Agreement was executed and the sale of the stock was consummated on April 10, 1998. Plaintiffs received from Cendant the initial portion of the purchase price—cash in an amount in excess of $110 million. ¶¶ 42, 49.

On April 15, 1998, Cendant issued a press release disclosing accounting irregularities in the CUC portion of its business. ¶¶ 4, 63; Exh. 1 to 4/25/00 Declaration of Daniel J. Beller. Cendant had known of the accounting irregularities before the consummation of the sale five days earlier,

---

**1.** Cendant was required to repeat this process after each of the four following quarters, because Net New Memberships was defined as excluding memberships which were not successfully billed or were cancelled before the renewal date. Thus, there was a time lag between the date when a membership started and the date when it could be used for calculating the Contingent Payment.

but had not disclosed these to Plaintiffs. ¶¶ 4, 69.

The public revelation of the fraud in CUC led to massive lawsuits against Cendant by its shareholders.[2] ¶ 76, 81(e).

During the several months following the closing, Allan Weinstein, a representative of Plaintiffs, had periodic conversations with Frank Murphy, a Cendant representative, in which Weinstein inquired generally about the status of Cendant's operation of Credentials' business. Everything was represented to Weinstein as proceeding in accordance with the terms of the Purchase Agreement. ¶ 77.

The accounting fraud in CUC caused great internal turmoil at Cendant, both before and after the public announcement, and resulted in Cendant's failing to devote resources to Credentials' business. ¶¶ 68, 81, 82. Cendant caused Credentials to default under its agreement with Citibank, which was of central importance to Credential's business; as a result, Citibank terminated the agreement shortly after Cendant acquired Credentials. ¶¶ 84, 56–58. There was a leap in Credentials' new memberships in the first few months following the closing (which Plaintiffs attribute to Credentials' previous marketing efforts), and then the rate of new membership acquisitions declined dramatically over the course of 1998. ¶ 88.

After the acquisition, some of the individual Plaintiffs continued to hold management-level positions at Credentials. ¶ 9. Within one year of the acquisition, Cendant terminated Credentials' employees, closed its offices and substantially ceased marketing its products. ¶ 5.

On August 28, 1998, Cendant filed with the Securities and Exchange Commission a lengthy Audit Report describing pervasive accounting fraud in CUC. ¶¶ 73, 74; Exh. 2 to Beller Decl.

On May 10, 1999, Plaintiffs received Cendant's certificate relating to the first Contingent Payment. It revealed that there were no Net New Memberships in excess of the Membership Threshold Amount, and that the first Contingent Payment was therefore zero. It also revealed that Credentials' business had effectively ceased to exist. ¶¶ 87, 88.

In December 1999, Cendant settled the shareholder lawsuits for $2.8 billion, the largest settlement of a class action securities case in history. ¶ 76.

On February 24, 2000, Plaintiffs filed the case at bar. On the same day, they filed a parallel action in Supreme Court, New York County. Exh. 4 to Beller Decl.

*LEGAL ANALYSIS*

■ "Litigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991).

Cendant and Lipton contend that the securities fraud claim is barred by the federal statute of limitations, because the complaint was not filed until more than one year after Plaintiffs had notice of the accounting irregularities.[3] Cendant Mem. at 3–7; Lipton Mem. at 13–14.

---

**2.** The complaint is vague about the timing of many of the events that took place after the April 10 closing. Hence, in this paragraph and the next three paragraphs, some of the allegations may not be listed in the correct chronological order.

**3.** For the sake of clarity, I use the phrase "accounting irregularities" to refer to the massive accounting fraud at CUC. I do this to avoid confusion between (a) references to the accounting fraud which had been occurring within CUC, and (b) references to the fraud

Plaintiffs contend that their securities fraud claim is timely for three reasons:

(a) The alleged fraud is not based on the non-disclosure of the accounting irregularities, but rather on misrepresentations about Cendant's intentions concerning its post-acquisition operation of Credentials' business. Plaintiffs allegedly did not have notice of those intentions until May 1999 (less than a year before the complaint was filed). Pl. Mem. re Cendant at 11–15; Pl. Mem. re Lipton at 2–6.

(b) The limitations period could not commence until Plaintiffs suffered injury, which allegedly did not occur until May 1999. Pl. Mem. re Cendant at 15–21; Pl. Mem. re Lipton at 6–12.

(c) Defendants' alleged concealment of the fraud requires equitable tolling of the statute of limitations until May 1999. Pl. Mem. re Cendant at 21–25; Pl. Mem. re Lipton at 12–15.

### 1. The Federal Statute of Limitations on the Non–Disclosure of the Accounting Irregularities

█ The complaint alleges that Defendants knew of the accounting irregularities prior to the closing on April 10, 1998, that they failed to disclose these to Plaintiffs, and that Plaintiffs would not have agreed to the terms of the Purchase Agreement, and in particular the Contingent Payment, if they had known of the accounting irregularities. ¶¶ 4, 101, 103.

On its face, the complaint establishes that Plaintiffs had ample information about the accounting irregularities by August 1998, when the Audit Report was filed.[4] ¶¶ 73, 74. See Exh. 2 to the Beller Decl. The complaint was filed more than a year later, in February 2000. Accordingly, the one-year statute of limitations bars the Section 10(b) claim to the extent that the fraud alleged is the non-disclosure of the accounting irregularities.[5]

### 2. Misrepresentations about Cendant's Intentions

The detailed complaint dwells principally upon non-disclosure of the accounting irregularities. Nevertheless, Plaintiffs' briefs contend that the alleged fraud is *not* based on that non-disclosure, but rather on misrepresentations and omissions about Cendant's intentions concerning its post-acquisition operation of Credentials:

> Plaintiffs were defrauded because Cendant misrepresented and failed to disclose that Cendant did not intend to operate Credentials in a good faith manner and effort likely to generate the contingency payments discussed by the parties and contemplated by Plaintiffs.

Pl. Mem. re Cendant at 13; Pl. Mem. re Lipton at 4 (with Corigliano's and Lipton's names added). On this basis, Plaintiffs assert that their securities fraud claim is timely because they allegedly had no notice of this fraud until May 1999. Pl. Mem. re Cendant at 12, 14; Pl. Mem. re Lipton at 3, 5.

---

upon Plaintiffs by concealing from them the facts concerning the CUC accounting fraud. The phrase "accounting irregularities" is not intended to minimize the scope or nature of the CUC accounting fraud.

4. Because the complaint was filed more than a year after the detailed disclosures in the August 1998 Audit Report, there is no need to consider whether earlier information, such as

the press release on April 15, 1998, gave sufficient notice to Plaintiffs.

5. The Section 10(b) claim based on the accounting irregularities cannot be rescued by either of Plaintiffs' arguments seeking to delay the date when the one-year statute starts to run. The possible application of those arguments to the Section 10(b) claim is discussed in Points 3 and 4 below.

Both defendants' reply briefs contend that the only fraud alleged in the complaint involves the non-disclosure of the accounting irregularities. Cendant Reply Mem. at 2–3; Lipton Reply Mem. at 2–3. It is true that non-disclosure of the accounting irregularities is the dominant aspect of the complaint's allegations of fraud. But the complaint does provide some basis for the second theory (that the plaintiffs were defrauded because Cendant misrepresented its intentions).

The statement of the Section 10(b) claim contains a suggestion that Cendant's intentions are part of the fraud claim, and there are some relevant factual allegations.[6] However, the sparse references to Cendant's intentions are mixed in with references to the failure to disclose the accounting irregularities, and the fraud claim on the basis of Cendant's intentions is not clearly set forth in the complaint.

Plaintiffs' briefs are emphatic that the alleged fraud is based on Cendant's intention not to perform its obligations with respect to its operation of Credentials. However, neither the complaint nor Plaintiffs' briefs make clear precisely what Plaintiffs consider those obligations to be. It is difficult to make out whether Plaintiffs are:

(a) referring only to Cendant's obligations under Section 5.11 of the Purchase Agreement, which specifies "reasonable commercial efforts [to market Credentials' products] substantially in accordance with the general historical practices of [CUC]"; or

(b) also asserting some additional obligation imposed on Cendant by reason of (i) an implied duty of good faith performance going beyond the specific provisions of Section 5.11, or (ii) alleged pre-closing oral representations that Plaintiffs contend survived the execution of the Purchase Agreement. See, e.g., the statement in Plaintiffs' briefs, quoted above at page 8, that Cendant did not intend "to operate Credentials in a good faith manner and effort likely to generate the contingency payments discussed by the parties and contemplated by Plaintiffs."

The amended complaint should state more precisely the obligations of Cendant that Plaintiffs say Cendant did not intend to perform.

■ a. *Intention Not to Perform the Contract.* An allegation that Cendant, at the time it entered into the Purchase Agreement, did not intend to perform specific marketing obligations may state a claim for relief under Section 10(b). "A person who promises to perform a specific act in the future, while secretly intending not to perform, violates Rule 10b–5, provided that the promise is given as consideration for the transfer of securities." *Mills v. Polar Molecular Corporation,* 12 F.3d 1170, 1175 (2d Cir.1993), citing *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986); *Fisk v. SuperAnnuities, Inc.,* 927 F.Supp. 718, 725 (S.D.N.Y.1996) (Kaplan, J.); *Finkel v. Stratton Corporation,* 754 F.Supp. 318, 329–30 (S.D.N.Y.1990) (Haight, J.).[7]

■ However, although Rule 9(b) allows a plaintiff to aver intent generally, a Section 10(b) complaint nevertheless must allege facts that raise a strong inference of fraudulent intent. *Mills,* 12 F.3d at 1176. In the present case, Plaintiffs must pro-

---

**6.** See allegations quoted in footnotes 8, 9 and 10 below.

**7.** In this respect, federal law is less restrictive on fraud claims than New York law is. See *Bridgestone/ Firestone, Inc. v. Recovery Credit Services, Inc.,* 98 F.3d 13, 20 (2d Cir.1996); *Cougar Audio, Inc. v. Reich,* 2000 WL 420546, *6 (S.D.N.Y. Apr. 18, 2000) (Sand, J.).

vide some basis for establishing that Cendant, *at the time it entered into the Purchase Agreement,* did not intend to operate Credentials in the required manner.

■ "The simple fact of nonperformance of a promise is insufficient to raise an inference of fraud." *Fisk,* 927 F.Supp. at 726. "A contract may be breached for legitimate business reasons.... Contractual breach, in and of itself, does not bespeak fraud ...." *Mills,* 12 F.3d at 1176.

■ The complaint alleges in paragraph 110 (which is part of the Second Claim, for common-law fraud) that Cendant "had no intention of trying to meet" the terms of the Purchase Agreement,[8] but this allegation is merely conclusory. Conclusory allegations are not sufficient to raise an inference of fraud. In *Finkel,* Judge Haight said:

> Allegations may be based on information and belief when facts are peculiarly within an opposing party's knowledge. [citations omitted] However, that exception to Rule 9(b)'s general requirement

of particularized pleading does not constitute a license to base claims of fraud on speculation or conclusory allegations. Where pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud .... Here the allegations are entirely conclusory. In essence, they proceed from the proposition that since certain future acts did not come to pass, defendants never intended to accomplish them .... Such bald and conclusory allegations are insufficient in law. They must be accompanied with specific allegations of fact giving rise to a strong inference of fraud.

754 F.Supp. at 329.

Nowhere does the complaint allege any fact to support the conclusory assertion that, *prior to the closing,* Cendant had formed an intention not to perform. The complaint contains some factual allegations concerning the impact of the accounting irregularities on Cendant's operation of Credentials [9], but these allegations do not

---

8. The point is less clearly stated in the Section 10(b) claim. *See* ¶ 100:

> *During the negotiation and consummation of the Acquisition* [the defendants failed to disclose] the material adverse information concerning CUC and Cendant, including the looming accounting scandal among the CUC operating units. Defendants also misrepresented, concealed, omitted and *failed to disclose the impact of the accounting fraud upon Cendant management's intentions and abilities* to advance Cendant's membership services business and, in particular, Credentials' business operations. [emphasis added]

9. ¶ 5: "On information and belief, the accounting fraud and resulting debacle at Cendant ... undermined Cendant's willingness and ability to operate Credentials' business in the manner agreed by the parties .... On information and belief, following the Acquisition, Cendant made little, if any effort to operate or grow Credentials..."

¶ 68: "On information and belief, the discovery of the accounting irregularities and fraud within Cendant caused Cendant to terminate or force the resignation of executives formerly associated with CUC ... and to replace them largely with personnel from the former HFS, Inc. Moreover, it caused Cendant to de-emphasize its commitment to the ... club membership portion of its business inherited from CUC and to scale back the resources devoted thereto."

¶ 82: "On information and belief, as Cendant came to appreciate the full significance of the vast accounting irregularities and fraud within the business of the former CUC, its direct marketing, club membership segment fell out of favor with Cendant's senior management, which was now principally controlled by ex-HFS personnel. Cendant, although it had adequate reserves to do so, consciously chose not to commit company resources to this business segment, including the resources necessary to maintain and grow the newly acquired Credentials as contemplated under the Stock Purchase Agreement."

say when the described events occurred. They do not provide a basis for inferring that Cendant's alleged intention was formed before the closing, rather than at some time thereafter. *See, e.g.,* ¶ 82 ("... as Cendant came to appreciate the full significance of the vast accounting irregularities ...."). If, after the closing, Cendant changed its intentions and decided, because of the accounting irregularities or for other reasons, not to devote the promised resources or effort to Credentials' business, this may provide a basis for a breach of contract claim, but it cannot form the basis for a fraud claim.

Moreover, one of the facts alleged by Plaintiffs strongly suggests that, at the time of the closing, Cendant did intend to operate Credentials profitably. The fact that Cendant paid over $110 million in cash at the closing appears to be inconsistent with Cendant's having, at that time, no intention to operate Credentials profitably. Especially in view of this $110 million payment, the complaint must provide more than speculation in order to raise a strong inference of fraud as required by Rule 9(b).

If a defendant knew at the time he entered into a contract that it was impossible for him to perform it, this would certainly imply that he secretly intended not to perform it. On the other hand, there would be no such implication if he merely believed that performance would be difficult. Here, Plaintiffs send contradictory signals as to whether they are asserting that the accounting irregularities made it *impossible* for Cendant to perform the contract.

The complaint alleges in paragraph 80 that the accounting irregularities meant that "Cendant *could never* achieve the 'historical' level of marketing" required under Section 5.11 of the Purchase Agreement. Paragraph 110 (which is part of the Second Claim, for common-law fraud) alleges that Defendants knew that Cendant *could not* meet the terms of the Purchase Agreement. Paragraph 71 offers a slightly different viewpoint; it alleges that Cendant'[s] ability to maintain and grow Credentials' membership base "would be seriously undermined, if not impossible to achieve, as a result of Cendant's financial difficulties." Plaintiffs' briefs repeat the allegation from paragraph 80 of the complaint, Pl. Mem. re Cendant at 10, but they also say that (a) many large corporations have recovered from similar scandals, (b) Cendant remains one of the largest direct marketing companies in the world, and (c) despite the "accounting debacle" at Cendant, there was "no basis at the time to believe that Cendant did not intend to carry out its obligations to properly operate and manage Credentials." Pl. Mem. re Cendant at 13–14; Pl. Brief re Lipton at 5. *See also* ¶ 82 ("Cendant, although it had adequate resources to do so, consciously chose not to commit company resources to this business segment ....").

If Plaintiffs are asserting that performance by Cendant was impossible, then this should be clearly alleged in the complaint, and be supported by allegations of facts sufficient to meet the requirements of Rule 9(b).

■ b. *Pre–Closing Oral Misrepresentations.* Plaintiffs' briefs, in their arguments, do not refer to specific allegations in the complaint containing the-pre-closing oral representations with respect to Cendant's intentions. Their statement of facts cites paragraphs 41 and 50–51 (Pl. Mem. re Cendant at 4–5), and it appears that the allegations in paragraphs 3 and 55

are also relevant.[10] Rule 9(b) requires that the complaint must (1) identify the misrepresentation, (2) identify the speaker, (3) identify the person spoken to, and (4) state where and when the misrepresentation was made. *Shahzad v. H.J. Meyers, Inc.*, 1997 WL 47817, at *6 (S.D.N.Y. Feb. 6, 1997) (Batts, J.). The complaint's allegations cited above fail to identify the person addressed, and are silent about where these representations were made (and vague about when [11]). Also, the allegations in paragraphs 3 and 51 fail to identify the speaker.

Furthermore, Plaintiffs are required to allege facts supporting the inference that the person making the representation knew at the time the representation was made that it was false. "[T]he Complaint must link the misleading statement with

facts that give rise to an inference that the speaker had a basis for knowing it was false." *Shahzad*, 1997 WL 47817, at *6. Plaintiffs have failed to do this, as discussed in the preceding section.

With respect to defendant Lipton, the complaint is particularly inadequate. Its allegation, in paragraph 75, that "[t]he Audit Report further revealed that ... Lipton w[as] fully aware of the nature and scope of the accounting fraud long before the April 10, 1998 closing," is contradicted by a reading of the Audit Report, which reveals no such thing.[12] No source or basis is given for the statements in Plaintiffs' brief asserting Lipton's pre-closing knowledge of the accounting irregularities. Pl. Mem. re Lipton at 16–17, 19. And the complaint does not allege (even in a con-

---

**10.** ¶ 3 alleges in part: "Cendant specifically assured Plaintiffs that, under Cendant's management, Credentials' membership base would grow to a size that would generate contingent payments under the terms of the Stock Purchase Agreement, in an amount that, together with the cash payment at closing, would equal or exceed Credentials' market value."

¶ 41: "As the negotiations progressed, Katz and Corigliano stated that Cendant's extensive resources combined with Cendant's plans to aggressively operate and grow Credentials offered a significant potential upside to the 'earn out' contingency payment."

¶ 50 describes Section 2.1(d) of the Purchase Agreement, and does not allege any representations.

¶ 51: "The Contingent Payment was a critical factor in Sellers' decision to sell their Credentials Stock to Cendant because the initial cash payment was substantially less than the valuation given to the company by Credentials' investment bankers during the IPO process. Sellers agreed to these terms *based on Defendants' representations* and contractual obligations that Cendant would continue to vigorously grow Credentials' membership base by, among other things, using Cendant's position as one of the largest direct marketing organizations in the world and a company with superior resources, to expand the mar-

keting of Credentials products through its existing co-marketing relationships and by cross-selling to Cendant's existing membership base." (emphasis added)

¶ 55: "... Katz and defendants Corigliano and Lipton represented on numerous occasions during the negotiation of the Acquisition that Cendant would aggressively seek to grow Credentials' business and customer base and that Credentials would benefit synergistically from other CUC operating units."

**11.** If a complaint alleges that a defendant made the same representation repeatedly over a specified period of time, the inability to provide the exact dates will not defeat a claim. *Pollack v. Laidlaw Holdings, Inc.*, 1995 WL 261518, at *9 (S.D.N.Y. May 3, 1995) (Cote, J.).

**12.** The Audit Report gives a detailed description of the accounting irregularities and the persons responsible for them. It does not attribute any participation or knowledge to Lipton. *See* Exh. 2 to Beller Decl. at 56–67. In general, the complaint's allegations are to be accepted as true for the purpose of the present motions; this does not require us to accept statements about a document incorporated by reference, if they are clearly contradicted by the document itself.

clusory manner) that Lipton had pre-closing knowledge about Cendant's alleged intention not to perform.

In order to assert personal liability against Lipton (who resigned from Cendant before the closing), Plaintiffs must plead, with the specificity required by Rule 9(b), the representations allegedly made by Lipton regarding Cendant's intentions, and must also plead specific facts sufficient to raise a strong inference that (a) Cendant, prior to the closing, had formed an intention not to perform, and (b) Cendant's said intention was known to Lipton at a time when she was still negotiating with Plaintiffs.

c. *Statute of Limitations.* Defendants' reply briefs raise issues as to whether the statute of limitations also bars Plaintiffs' Section 10(b) claim insofar as it is based on Cendant's intentions.

The complaint seems to allege that May 10, 1999, was when Plaintiffs first received notice that Cendant's intentions had been misrepresented.[13] *If that date is correct, then the limitations period would start to run from May 10, 1999, and Plaintiffs' Section 10(b) claim based on Cendant's intentions would be timely. However, certain facts alleged in the complaint suggest that Plaintiffs should be charged with notice (or inquiry notice) as of an earlier date.*

*First.* Lipton points out that Plaintiffs had notice of the accounting irregularities by August 1998. The complaint alleges (at some places) that the massive accounting irregularities made it impossible for Cendant to perform its marketing obligations. ¶¶ 80, 110. Accepting that allegation as true for purposes of this motion, Lipton argues that Plaintiffs' notice of the accounting irregularities means that Plain-

tiffs also had notice by August 1998 that Cendant could not perform its marketing obligations. Lipton Reply Mem. at 4.

However, as discussed above at page 13, other statements in the complaint and in Plaintiffs' briefs make it unclear whether Plaintiffs are asserting that performance by Cendant was impossible. Due to the complaint's lack of clarity on this point, the issue cannot be determined on the present motions to dismiss. If Plaintiffs file an amended complaint, the issue can be addressed at that time.

 *Second.* The complaint alleges that some of the Plaintiffs held management-level positions in Credentials after the acquisition. ¶ 9. Cendant argues that Plaintiffs therefore had knowledge regarding Cendant's operation of Credentials. Cendant Reply Mem. at 9. This raises the question whether Plaintiffs had notice, prior to February 24, 1999 (a year before the complaint was filed), of the termination of the important Citibank agreement and other alleged failures by Cendant to operate Credentials in good faith, or had sufficient "storm warnings" to put Plaintiffs at least on inquiry notice.

 This issue cannot be determined on the present motions to dismiss. The complaint merely states that some Plaintiffs continued to hold management-level positions at Credentials (for an unspecified period of time) after the closing. While this would suggest that Plaintiffs had some knowledge about the post-acquisition performance of Credentials, it is insufficient by itself to establish, as a matter of law, that Plaintiffs were on notice or inquiry notice of intentional non-performance by Cendant. Furthermore, even if it were determined that Plaintiffs had inquiry notice prior to February 1999, the

---

13. *The complaint suggests this at paragraphs 5, 87 and 88, although not as explicitly as in* Plaintiffs' briefs. Pl. Mem. re Cendant at 14; Pl. Mem re Lipton at 5.

information in the complaint is insufficient to charge them with actual notice. The rule is that a plaintiff with inquiry notice who fails to exercise reasonable care and diligence in seeking to uncover the facts underlying the fraud will be charged with notice of such facts as a diligent inquiry would have disclosed. *Dodds v. Cigna Securities, Inc.*, 12 F.3d 346, 350 (2d Cir. 1993); *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir.2000). On the basis of the facts alleged in the complaint, Plaintiffs, if they were on inquiry notice, failed to meet the requirement of diligent inquiry,[14] but the complaint does not provide a sufficient basis to determine what facts a diligent inquiry would have uncovered.

As with the preceding argument, Defendants may raise this argument again at the appropriate time if Plaintiffs file an amended complaint.

■ d. *A Summary of Problems with the Fraud Claim Based on Cendant's Intentions.* Plaintiff's Section 10(b) claim based on Cendant's intentions does not satisfy the requirements of Rule 9(b). When a motion to dismiss the initial complaint is granted, the plaintiffs should be permitted to file an amended complaint unless they would be unable to allege any facts sufficient to support their claim. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), *cert. den.*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). In the present case,

there is a possibility (even though it might appear unlikely) that Plaintiffs may be able to allege facts sufficient to raise a strong inference that Cendant (at the time of the closing) did not intend to perform its marketing obligations. Accordingly, I recommend that Plaintiffs be granted permission to file an amended complaint.

The various problems with the Section 10(b) claim stem from the fact that, because of the federal limitations period, the Section 10(b) claim cannot be based on non-disclosure of the accounting irregularities.[15] Faced with this restriction, Plaintiffs essentially attempt to turn a breach-of-contract claim into a fraud claim by asserting that Cendant did not intend to perform the contract. This attempt can succeed only if (a) Plaintiffs can plead the specific facts necessary to raise a strong inference that Cendant (at the time of the closing) did not intend to perform specific promises, and (b) Plaintiffs did not have notice of such intention prior to February 24, 1999.

3. *Plaintiffs' Argument that They Suffered No Injury until May 1999*

■ Plaintiffs argue that the limitations period could not begin until Plaintiffs suffered injury, which they contend did not occur until May 1999, when they were informed that there would be no Contingent Payment. Pl. Mem. re Cendant at 15–21; Pl. Mem. re Lipton at 6–12.

---

**14.** The complaint alleges that Plaintiffs' representative made periodic phone calls to a Cendant executive during "the several months following the Acquisition," and, in response to general inquiries as to the status of Cendant's operation of Credential's business, was told that everything with respect to Credentials was proceeding in accordance with the contractual terms. ¶ 77. However, once a plaintiff is on inquiry notice, misleading statements or reassurances by the defendant do not relieve him of his duty to undertake reasonable inquiry. *Siemens Solar Industries v.*

*Atlantic Richfield Company*, 1994 WL 86368, *4 (S.D.N.Y. March 16, 1994) (Preska, J.); *Falik v. Parker Duryee Rosoff & Haft*, 869 F.Supp. 228, 232 (S.D.N.Y.1994) (Motley, J.); *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 815 F.Supp. 620, 640 (S.D.N.Y.1993) (Sweet, J.).

**15.** This obstacle does not exist with respect to Plaintiffs' common-law fraud claim, because of New York's longer limitations period.

In Plaintiffs' briefs, this argument is couched in terms of the second fraud theory (non-disclosure of Cendant's intentions). If Plaintiffs first received notice in May 1999 that Cendant's intentions had been misrepresented, then the statute of limitations on Plaintiffs' claim would start to run in May 1999, and Plaintiffs would have no need for this "no injury" argument. However, as discussed above, there are facts alleged in the complaint which suggest that Plaintiffs may be charged with notice as of an earlier date. In that event, Plaintiffs' "no injury" argument, if it has merit, would serve to rescue the Section 10(b) claim. Likewise, this argument could also serve to rescue to the first fraud theory (non-disclosure of the accounting irregularities).

However, the "no injury" argument has no merit. Under either theory of fraud, Plaintiffs suffered injury in April 1998, when they entered into the Purchase Agreement.

Plaintiffs are incorrect in asserting that they received no injury until Cendant failed to make the first Contingent Payment. The complaint alleges that Defendants' fraud induced Plaintiffs to enter into the Purchase Agreement on terms (including the Contingent Payment) which they would not have accepted if they had known the undisclosed facts. ¶¶ 70, 103. Hence, the "injury" from this fraud occurred when Plaintiffs entered into the Purchase Agreement on those terms.

For many years, the federal courts in New York discussed the issue of when a Section 10(b) cause of action "accrued," and when a Section 10(b) plaintiff suffered "injury." They did so because, until 1990, they used state law to determine the limitations period, and the New York rule was "within six years from the time the cause of action *accrued* or within two years from the time the wrongdoing was, or with rea-sonable diligence should have been, discovered." *Armstrong v. McAlpin,* 699 F.2d 79, 87 (2d Cir.1983) (emphasis added). At the same time, they used "federal law ... to determine when the limitation period starts to run." *Stull v. Bayard,* 561 F.2d 429, 432 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978).

In *Rice v. Baron,* 456 F.Supp. 1361 (S.D.N.Y.1978), Judge Carter, looking to federal law to determine the date of accrual of a Section 10(b) claim, stated:

> The statute of limitations began to run ... from the time when plaintiff first suffered a loss as a result of defendant's fraudulent conduct, that is, when a plaintiff with assumed knowledge of the fraudulent wrong could first have asserted a claim for relief.... It would seem to be beyond dispute that the date from which the statute of limitations began to run on [plaintiff's] claims was ... the date on which [plaintiff] entered into the written contract with [defendant] to repurchase its shares.... [Plaintiff's] claim in this litigation is that [defendant] fraudulently induced it to enter into a contract to repurchase its own shares. [Plaintiff] allegedly suffered injury in that it bought shares it would not have purchased had the material facts ... been disclosed.

456 F.Supp. at 1368.

In *Lenz v. Associated Inns & Restaurants Co. of Am.,* 833 F.Supp. 362, 370 (S.D.N.Y.1993), Judge Conboy stated:

> "In a securities fraud action, such a cognizable injury occurs at the time an investor enters ... a transaction as a result of material misrepresentations." *Zola v. Gordon,* 685 F.Supp. 354, 363 n. 10 (S.D.N.Y.1988) ("*Zola I*") (quoting

*Volk v. D.A. Davidson,* 816 F.2d 1406, 1412 (9th Cir.1987)).

833 F.Supp. at 370 (omission in original).[16]

In *In re Integrated Resources Real Estate Limited Partnerships Securities Litigation,* 850 F.Supp. 1105 (S.D.N.Y.1993) (RICO claim based on 10(b) violation), the plaintiffs, who allegedly were fraudulently induced to purchase limited partnership interests in Integrated, claimed that their injury occurred when the bankruptcy of Integrated was announced. Judge Sweet held that "the injury occurred at the time of investment—not at the time of Integrated's declaration of bankruptcy." 850 F.Supp. at 1124. The same conclusion has been stated in other RICO cases based on Section 10(b) violations relating to the fraudulently-induced purchase of limited partnership interests. *See In re Merrill Lynch Ltd. Partnerships Litigation,* 7 F.Supp.2d 256, 262–64 (S.D.N.Y.1997) (collecting cases), *aff'd per curiam,* 154 F.3d 56 (2d Cir.1998), where Judge Mukasey said:

> Plaintiffs' RICO claims are based upon defendants' alleged fraudulent statements and omissions which induced plaintiffs to invest in the limited partnerships. Therefore, under the rule of these cases, plaintiffs sustained injury at the time of their investment.

7 F.Supp.2d at 262–263.[17]

Judge Mukasey further observed that "a RICO claim accrues when the plaintiff has sustained an injury, even if the amount of the damage is not certain." 7 F.Supp.2d at 264, citing, inter alia, *Butala v. Agashiwala,* 916 F.Supp. 314, 317 (S.D.N.Y.1996) (Koeltl, J.). In *Butala,* Judge Koeltl said:

> The plaintiffs' argument that their cause of action did not accrue until their damages were ascertainable is premised on a misunderstanding of the difference between when an injury occurs and when the damages resulting from that injury are fully quantifiable.... The plaintiffs allege that these investments were fraudulent from their inception. Consequently, the plaintiffs were injured when they purchased them.

916 F.Supp. at 317.

In the present case, it is beyond question (taking Plaintiffs' allegations as true) that Plaintiffs inevitably suffered injury, under either theory of fraud.

With respect to fraud based on Cendant's intentions: Plaintiffs allege that the

---

**16.** In *Lenz,* the plaintiff alleged that he was induced to buy an interest in a limited partnership by fraudulent misrepresentations about the investment's future profitability. The project was represented as expected to lose money for two or three years, giving Lenz a tax write-off, and then to begin to generate profits and ultimately a cash return. The investment produced the promised losses for the first few years, but continued to incur losses thereafter and was ultimately sold at a loss. Thus, it was not until three years after his investment that Lenz began to suffer the losses which he had been promised would not occur. Nevertheless, the court, in the course of ruling that the action was barred by the statute of limitations, said that the injury occurred at the time the investment was made.

**17.** Based on the requirement in RICO cases that a creditor must exhaust his other available remedies before seeking RICO treble damages, Judge Mukasey recognized a limited exception to the general rule that the RICO cause of action is ripe at the time of investment. The exception is "limited to actions involving debt instruments which contain bargained-for remedies after default which the debtor is expected to pursue." 7 F.Supp.2d at 263. See also *BRS Associates, L.P. v. Dansker,* 246 B.R. 755, 770 (S.D.N.Y. Mar. 7, 2000) (Batts, J.). Since the case at bar is not a RICO case requiring the exhaustion of other remedies before seeking treble damages, and since the Plaintiffs are not holders of debt instruments containing other remedies, the exception appears inapplicable to the present case.

size of the Contingent Payment was "highly dependent" on Cendant's marketing efforts. ¶ 3. Taking this allegation as true, Cendant's alleged intention not to perform its marketing obligations would therefore affect the Contingent Payment, which was highly variable; even if a Contingent Payment were to be made, it would be smaller than it would have been if Cendant had intended to perform its promised marketing efforts. Plaintiffs would inevitably suffer damages, and the only question would be the amount.

With respect to fraud based on undisclosed accounting irregularities: (A) If Plaintiffs are alleging that the accounting irregularities made Cendant's performance impossible, then the situation is the same as with Cendant's intention not to perform. (B) If Plaintiffs are merely alleging that the accounting irregularities made performance difficult, then Plaintiffs still suffered injury; even if there was a *possibility* that things might work out (and that a "satisfactory" Contingent Payment might be made) despite the accounting irregularities, nevertheless the additional risk that things might *not* work out was not a risk Plaintiffs bargained for when they entered into the Purchase Agreement. As to the value to be attributed to that risk, the complaint alleges that Cendant failed to disclose the accounting irregularities in order to "... prevent [Plaintiffs] from demanding an increased payment at the closing in lieu of an agreement to accept deferred compensation based on future membership growth" (¶ 70), and further alleges that "Defendants and [Plaintiffs] concurred that Credentials' fair market value was approximately $170 million" (¶ 3). While the exact size of the appropriate "increased payment" might be disputed, the only question is the amount (and not the existence) of Plaintiffs' injury. (C) Plaintiffs cannot argue that the accounting ir-

regularities had no significant impact on the chance that Cendant would make a Contingent Payment; such an argument would contradict the very basis of the fraud claim.

Plaintiffs cite *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.,* 522 U.S. 192, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997). That case merely shows that a cause of action does not arise until the defendant does some wrongful act.

*Bay Area Laundry* was an action by a multi-employer pension plan seeking to collect withdrawal liability from an employer who had withdrawn from the plan. The Supreme Court held that a plan's interest in receiving withdrawal liability does not ripen into a cause of action triggering the limitations period until (a) the plan trustees calculate the penalty payments and set a payment schedule, and (b) the employer defaults on an installment due under the trustees' schedule. Only then has the employer "violated an obligation owed to the plan." 522 U.S. at 202, 118 S.Ct. at 549. "[A]n employer does not violate the [Act] simply by exiting the plan. The Act takes as a given that employers may withdraw." 522 U.S. at 201, 118 S.Ct. at 548.

In the case at bar, Defendants did commit a wrongful act, when they failed to disclose the accounting irregularities (or, under the second theory, failed to disclose Cendant's intentions) prior to the closing. As soon as Plaintiffs had notice of the undisclosed facts, they had a basis upon which to obtain relief. The fact that the amount of their damages may have been uncertain did not mean that they had no cause of action. *In re Merrill Lynch,* 7 F.Supp 2d at 264, *Butala,* 916 F.Supp. at 317.

■ Of course, they could choose to wait and hope that, nevertheless, a satisfactory Contingent Payment might be forthcoming. But if they waited for more than a year after they had notice of the violation, then the federal statute of limitations bars their Section 10(b) claim. "The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides whether to invoke the provisions of the Act." *Stull*, 561 F.2d at 432.

Plaintiffs also cite *Bauman v. Centex Corp.*, 611 F.2d 1115 (5th Cir.1980), to support their contention that their Section 10(b) cause of action did not accrue until Cendant failed to make the first Contingent Payment. *Bauman*, however, was applying the Texas law of fraud.[18] In *Bauman*, the court found that there had been a possibility that the plaintiff would suffer no injury; in the case at bar, as discussed at pages 23–24 above, it is beyond question (assuming the truth of their allegations) that Plaintiffs sustained injury when the misrepresentations prevented Plaintiffs from demanding an increased payment at the closing. *Bauman* was discussing whether the injury occurred (a) at the time of the defendant's misrepresentation or (b) at the time when plaintiff's damages became clear. The opinion did not discuss the issue of whether the plaintiff suffered a legal injury at the time he signed the contract (in reliance on the misrepresentation). If *Bauman* is to be taken, nevertheless, as holding that a plaintiff who is fraudulently induced to enter into a contract does not suffer a legal injury at the time of contract, then *Bauman* is contrary to the law in our Circuit applicable to Section 10(b) fraud actions. *See Rice, Lenz* and the other cases discussed on pages 21–23 above.

Moreover, the Supreme Court held in *Lampf* that the statute of limitations for Section 10(b) claims is Section 9(e) of The Securities Exchange Act of 1934, 15 U.S.C. § 78i(e), which says "one year after the discovery of the facts constituting the violation." What Plaintiffs seek, in effect, is to have our Court change the statutory language to "one year after the discovery of the facts constituting the cause of action." Such language was considered and

---

**18.** The facts in *Bauman* were similar to the present case. In *Bauman*, the plaintiffs sold their corporation (CCI) to defendant Centex in exchange for shares of Centex stock. The agreement provided that half of the stock was to be held in escrow for four years, subject to an "earnout" based on CCI's future performance. The plaintiffs alleged that Centex had made various misrepresentations about its prospective post-acquisition operation of CCI. The earnout requirement was not met, and the escrowed stock reverted to Centex. The jury found for the plaintiffs. The Fifth Circuit, applying the two-year Texas statute of limitations, stated:

> The general rule is that a tort cause of action accrues when the tort is committed. This rule is followed despite difficulty in ascertaining damages until a later date.

611 F.2d at 1117, citing *Quinn v. Press*, 135 Tex. 60, 140 S.W.2d 438 (1940). However, after quoting from Texas negligence cases holding that a cause of action does not arise until a legal injury occurs, the Fifth Circuit went on to state:

> Until the escrow agreement expired and the stock reverted to Centex there was no legal injury, however, since *it was possible* that the earnout would be made in spite of any misrepresentations by defendants. Misrepresentation in itself is not "a completed wrong" until there is an invasion of some right of the plaintiff. Texas courts have held that "(a) false statement alone, does not create a cause of action for fraud ... there must be reliance by the complainant to his detriment."

611 F.2d at 1118 (citation omitted) (emphasis added). The Fifth Circuit did not explain why the "reliance" was not the act of entering into the escrow agreement.

rejected by the Supreme Court in *Lampf*.[19] Hence *Lampf* appears to preclude Plaintiffs' implicit attempt to rewrite the applicable statute of limitations.

### 4. *Plaintiffs' Argument for Equitable Tolling*

 Plaintiffs contend that Cendant's active and passive concealment of the fraud requires equitable tolling of the statute of limitations. Pl. Mem. re Cendant at 21–25; Pl. Mem. re Lipton at 12–15. Equitable tolling delays the commencement of the limitations period until the plaintiff acquires notice of the fraud. The doctrine of equitable tolling is not applicable to the statute of limitations in Section 10(b) cases, as the Supreme Court expressly ruled in *Lampf*:

> [I]t is evident that the equitable tolling doctrine is fundamentally inconsistent with the 1– and 3–year structure. The

1–year period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary. The 3–year limit is a period of repose inconsistent with tolling.

501 U.S. at 363, 111 S.Ct. at 2782. The courts of this circuit have recognized that, under *Lampf*, equitable tolling does not apply to Section 10(b) claims. *Rothman v. Gregor*, 220 F.3d 81, 97 (2d Cir.2000); *Friedman v. Wheat First Securities*, 64 F.Supp.2d 338, 340 (S.D.N.Y.1999)(Ward, J.)[20].

While equitable tolling does not apply here, a related concept—that a plaintiff who has inquiry notice will not be charged with actual notice so long as he exercises reasonable diligence in seeking to learn the facts which would disclose fraud—does apply in Section 10(b) cases. *Rothman*, 220 F.3d at 96–97 (ruling that whether the plaintiff's claim was time-barred depended

19. In *Lampf*, the Supreme Court specifically considered alternative formulations for the limitations period to be applicable to Section 10(b) cases, stating:

> *Section 9* of the 1934 Act, 15 U.S.C. § 78i, pertaining to the willful manipulation of security prices, *and § 18*, 15 U.S.C. § 78r, relating to misleading filings, target the precise dangers that are the focus of § 10(b).

501 U.S. at 360, 111 S.Ct. at 2781 (emphasis added). In footnote 6, the Supreme Court set forth the slightly differing words used by Congress in setting limitations periods for Section 9 and Section 18:

> Section 9(e) of the 1934 Act provides: "No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts *constituting the violation* and within three years after such violation." 15 U.S.C. § 78i(e).
>
> Section 18(c) of the 1934 Act provides: "No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts *constituting the cause of action* and within three years after such cause of action accrued." 15 U.S.C. § 78r(c).

501 U.S. at 360 n. 6, 111 S.Ct. at 2780 n. 6 (emphasis added). The Supreme Court then chose Section 9(e) *instead of* Section 18(c):

> The Commission notes, correctly, that the various periods contained in the 1934 and 1933 Acts differ slightly in terminology. To the extent that these distinctions in the future might prove significant, *we select* as the governing standard for an action under § 10(b) *the language of § 9(e)* of the 1934 Act, 15 U.S.C. § 78i(e).

501 U.S. at 364 n. 9, 111 S.Ct. at 2782 n. 9 (emphasis added). Congress responded to *Lampf* on the issue of retroactivity, but did not alter the *Lampf* selection of Section 9(e) as the statute of limitations for Section 10(b) cases. 15 U.S.C. § 78aa–1.

20. Plaintiff cites *Rotella v. Wood*, 528 U.S. 549, 120 S.Ct. 1075, 1083, 145 L.Ed.2d 1047 (2000), for the proposition that "[t]he doctrine of equitable estoppel is deemed to apply to all federal statutes of limitation." Pl. Mem. re Cendant at 21; Pl. Mem. re Lipton, at 12. *Rotella* (at 1084) merely says that "federal statutes of limitation are generally subject to equitable principles of tolling . . . ." This cannot be taken as overruling *Lampf*.

on whether plaintiffs, in the exercise of reasonable diligence, should have uncovered the facts underlying the alleged fraud, and, at 97 n. 1, distinguishing this inquiry from equitable tolling).

If Plaintiffs had neither actual nor inquiry notice of Cendant's alleged intention until May 10, 1999, as they allege, then the one-year limitations period would begin to run on that date, and Plaintiffs "tolling" argument is unnecessary.[21] On the other hand, if Plaintiffs are charged with inquiry notice prior to February 24, 1999 (one year before the complaint was filed), then Plaintiffs' "tolling" argument will be relevant to the issue of whether Plaintiffs acted diligently after being put on inquiry notice. That issue was discussed in part 2c above.

### 5. Lipton's Argument about the Merger Clause

■ As an additional ground for dismissal, Lipton argues that the representations allegedly made by her are barred by a merger clause in the Purchase Agreement. This argument does not provide a basis for dismissing the complaint at this stage.

Plaintiffs must prove reasonable reliance as an element of a Section 10(b) claim. *Harsco Corp. v. Segui*, 91 F.3d at 342; *Chavin v. McKelvey*, 25 F.Supp.2d 231, 235 (S.D.N.Y.1998) (Sheindlin, J.), *aff'd*, 182 F.3d 898 (2d Cir.1999) (table). Section 5.11 of the Purchase Agreement spells out Cendant's obligations with respect to marketing efforts for Credentials' business. Section 9.5 of the Purchase Agreement contains a general merger clause which provides that the Purchase Agreement supersedes all prior oral understandings. Whether, under these circumstances, Plaintiffs could reasonably rely on the alleged prior oral statements of Lipton (relating to Cendant's post-acquisition marketing efforts) involves factual issues not properly decided on this motion to dismiss.

■ Courts consider a number of factors in determining whether prior oral representations are barred by a merger clause, such as: whether the plaintiff was sophisticated and represented by counsel in arm's length negotiations; whether the representation's subject matter was covered by the written agreement; the specificity of any disclaimer; the specificity of the defendant's representations in the written agreement; and other relevant circumstances.

Some of these issues involve factual determinations going beyond the matters alleged in the complaint. For example, one would suppose that Plaintiffs were (as repeatedly stated in Lipton's briefs) sophisticated investors represented by counsel, but these are not facts alleged in the complaint.

Accordingly, the resolution of this issue should be deferred. If Plaintiffs choose to file an amended complaint, then Defendants can raise the issue again at the appropriate time.

### 6. Lipton's Request for a Stay of Federal Court Proceedings

■ If Judge Batts decides not to dismiss the federal claim against Lipton with prejudice, then Lipton requests that the proceedings in this Court be stayed pending resolution of the proceedings in Supreme Court, New York County, where Plaintiffs have filed a parallel lawsuit. Lipton Mem. at 15–17; Exh. 5 to Beller Decl.

---

**21.** The issue of due diligence by a plaintiff with inquiry notice is irrelevant to the theory of fraud based on the undisclosed accounting irregularities. Plaintiffs have not disputed that they were on notice of those facts in August 1998.

There are no exceptional circumstances in the present case that would warrant abstention by this Court under *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). The thorough analysis of the application of *Colorado River* set forth in Plaintiffs' brief, Pl. Mem. re Lipton at 22–25, is virtually uncontested by Lipton's reply brief. Lipton Reply Mem. at 10 n. 5.

I recommend that Judge Batts deny Lipton's request for a stay of the proceedings in this Court.

## SUMMARY AND RECOMMENDATION

Plaintiffs' Section 10(b) claim

(1) is barred by the statute of limitations, insofar as it alleges fraud based on non-disclosure of the accounting irregularities, and

(2) fails to meet the requirements of Rule 9(b) insofar as it alleges fraud based on misrepresentations and omissions concerning Cendant's intentions.

Accordingly, I recommend that Judge Batts grant the motions of Cendant and Lipton to dismiss the complaint. I also recommend that Plaintiffs should be granted leave to file an Amended Complaint, on the following conditions:

1. Because of the federal statute of limitations, the Amended Complaint may not assert that the defendants are liable under Section 10(b) for failure to disclose the accounting irregularities. The Amended Complaint may describe the accounting irregularities as background to the Section 10(b) claim. Also, of course, the Amended Complaint may allege the non-disclosure of the accounting irregularities as the basis of its common-law fraud claim or other state-law claims.

2. Any claim for fraud (whether Section 10(b) or common-law fraud or otherwise) must comply with the requirements of Rule 9(b), and also, of course, the requirements of Rule 11, F.R.Civ.P. The Amended Complaint must state, separately for each alleged representation, (a) the date and place the representation was made, (b) the person or persons making the representation, (c) the person or persons to whom the representation was made, and (d) specific facts sufficient to raise a strong inference that the speaker knew, at the time the representation was made, that the representation was false. Exact dates may be excused if the Amended Complaint alleges that a defendant repeated the same representation over a specified period of time.

3. Additionally, with respect to the Section 10(b) claim, the Amended Complaint must clearly state the legal basis for the claim. In order to cull out time-barred allegations, the Amended Complaint must specifically identify each allegation relied on for the Section 10(b) claim. The Amended Complaint must clearly identify the obligations which Cendant allegedly intended not to perform. If Plaintiffs are asserting that performance by Cendant was impossible, then the Amended Complaint must allege this clearly and support this with allegations of fact.

4. In particular, as to Lipton, the Amended Complaint must allege facts sufficient to raise a strong inference that (a) Cendant, prior to the closing, had formed an intention not to perform, and (b) Cendant's said intention was known to Lipton at a time when she was still negotiating with Plaintiffs.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 10 business days after being served with a copy, by filing written objections with the Clerk of the U.S. District Court and mailing copies (a)

to the opposing party, (b) to the Hon. Deborah A. Batts, U.S.D.J. at Room 2510, 500 Pearl Street, New York, N.Y. 10007 and (c) to me at Room 1360, 500 Pearl Street. Failure to file objections within 10 business days will preclude appellate review. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988). Any request for an extension of time must be addressed to the District Judge.

October 31, 2000.